637 So.2d 771 (1994)
Carole MYERS and Dean Myers
v.
AMERICAN SEATING COMPANY.
No. 93 CA 1350.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
*772 John P. Wolff, III, Baton Rouge, for plaintiffs-appellants Carole Myers and Dean Myers.
Harold Adkins, Baton Rouge, for intervenor-appellant EBRP School Bd.
Lindsay Larson, Thomas Loehn, New Orleans, for defendant-appellee American Seating Co.
Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment granting a directed verdict in favor of defendants.

FACTS
On October 17, 1989, Carole Myers was seriously injured during the course and scope of her employment with East Baton Rouge Parish School Board as executive secretary at Winbourne Elementary. On the day of the accident, Myers stepped onto the rear of the seat of a folding chair ("54-folder") in order to place certain items on a ledge. As she stepped onto the chair, the seat suddenly folded ("jackknifed"), causing her foot and leg to slip through the opening. As a result of this accident, Myers sustained serious injuries to her leg.
On August 3, 1990, Carole Myers and her husband, Dean, filed a petition for damages against American Seating Company (American Seating), the manufacturer of the chair, claiming that the chair was unreasonably dangerous. On August 24, 1990, plaintiffs filed a supplemental and amending petition, adding as a defendant MISSCO Corporation of Jackson, Inc. (MISSCO), the alleged seller of the chair.[1]
On November 5, 1990, East Baton Rouge Parish School Board (the School Board) filed a petition of intervention, alleging its entitlement to recovery of worker's compensation benefits and medical expenses paid, or to be paid, to, or on behalf of, Carole Myers.
On January 5, 1993, the Myerses again filed a supplemental and amending petition, adding as a defendant St. Paul Fire and Marine Insurance Company, which allegedly *773 had in effect a policy of insurance providing coverage at the time of the accident.[2]
On March 15-19, 1993, the matter was tried before a jury. After the Myerses presented their case, American Seating moved for a directed verdict, asserting that the Myerses had not shown the chair to be unreasonably dangerous in accordance with the Louisiana Products Liability Act. The trial judge took the matter under advisement, and, after American Seating presented its case, the trial judge granted the directed verdict. On March 29, 1993, the trial judge signed a judgment in favor of American Seating, dismissing the Myerses' claims with prejudice at their cost.[3]
The Myerses appealed from the adverse judgment, assigning the following specifications of error:
1. The trial court erred in granting a directed verdict because the plaintiff presented more than sufficient evidence to establish a prima facie case of products liability, from which reasonable minds could conclude that American Seating Company was liable for Carole Myers' injuries.
2. The trial court erred in refusing to admit evidence of conversations that plaintiff's design engineering expert had with a former employee of American Seating Company.
The School Board also appealed from the judgment, raising the following issues for review:
1. Whether the trial court erred in granting a directed verdict in favor of American Seating Company.
2. Whether the East Baton Rouge Parish School Board is entitled to recover from American Seating Company the total amount of worker's compensation and medical benefits paid or to be paid to or on behalf of Carole Myers.

HEARSAY EVIDENCE
The Myerses contend that the trial court erred in refusing to admit evidence of a conversation between their expert, Bruce Donnell, and a former employee of American Seating, John Dexter. The Myerses reason that Donnell used the information he obtained from Dexter as a basis for his opinion as to whether the 54-folder was unreasonably dangerous. A tape recording of the conversation and a transcription of the recording were proffered at trial.[4]
"Hearsay" is defined in LSA-C.E. art. 801C as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. Hearsay is not admissible except as provided by the Code of Evidence or other legislation. LSA-C.E. art. 802.
The Myerses acknowledge that the proffered evidence is hearsay; however, they argue that the hearsay evidence was admissible under LSA-C.E. art. 703, which provides as follows:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. (Emphasis added).
Comment (d) to LSA-C.E. art. 703 provides as follows:
Under this Article the facts or data underlying the expert witness' opinion may properly be: (1) matters within his firsthand knowledge; (2) facts or data presented to him at trial, thus approving the use of hypothetical questions; and (3) under designated circumstances, facts or data not admissible in evidence (because, for example, their source is inadmissible hearsay), if *774 they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinions or inferences. Whether the facts or data may be "reasonably relied upon" in this fashion is a question for the court under Article 104(A). (Citations omitted).
The fact that the expert may base his opinion or inference on inadmissible evidence does not necessarily imply that the expert may relate such information to the jury. Whether he may do so is governed by LSA-C.E. arts. 705[5] and 403. See Comment (f) to LSA-C.E. art. 703.
LSA-C.E. art. 403 provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. A trial court is granted wide discretion in determining whether the probative value of evidence is outweighed by the danger of unfair prejudice, and its finding will not be disturbed on appeal in the absence of an abuse of that discretion. See State v. Bodley, 394 So.2d 584, 595 (La.1981).
The record indicates that the trial court considered the hearsay evidence extremely prejudicial to American Seating and, therefore, ruled it inadmissible. After reviewing the proffered evidence, we conclude that the trial court did not abuse his much discretion in ruling the evidence inadmissible.

DIRECTED VERDICT
The Myerses and the School Board contend that the trial court erred in granting American Seating's motion for directed verdict.
LSA-C.C.P. art. 1810 provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial judge has much discretion in determining whether to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La.App. 2nd Cir.1991); Barnes v. Thames, 578 So.2d at 1162. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Adams v. Travelers Insurance Company, 589 So.2d at 608.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992); Cliburn v. Colonial Penn Insurance Company, 583 So.2d 103, 105 (La.App. 3rd Cir.1991). It is axiomatic that the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. *775 Adams v. Travelers Insurance Company, 589 So.2d at 608.
The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of liability for manufacturers for damage caused by their products in LSA-R.S. 9:2800.54:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section. (Emphasis added).
"Reasonably anticipated use" is defined in LSA-R.S. 9:2800.53(7) as:
[A] use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances.
This definition is narrower in scope than its pre-LPLA counterpart, "normal use," which included "all reasonably foreseeable uses and misuses of the product." Daigle v. Audi of America, Inc., 598 So.2d 1304, 1307 (La.App. 3rd Cir.), writ denied 604 So.2d 1306 (La. 1992); Walker v. Babcock Industries, Inc., 582 So.2d 258, 260 (La.App. 1st Cir.1991), citing Bloxom v. Bloxom, 512 So.2d 839, 841 (La.1987), for the definition of "normal use," and John Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565 (1989), for the narrower scope of the LPLA "reasonably anticipated use."[6]
In Daigle v. Audi of America, Inc., 598 So.2d at 1307, the court quoted from Kennedy's law review article which states:
The standard for determining a reasonably anticipated use, therefore, is objective (an ordinary person in the same or similar circumstances) and, like "normal use," what constitutes a reasonably anticipated use is to be ascertained from the point of view of the manufacturer at the time of manufacture. "Reasonably anticipated use," however, should prove to be superior to "normal use" in discouraging the fact-finder from using hindsight because of the words "reasonably anticipated."
"Reasonably anticipated use" will also be more effective than "normal use" in conveying the important message that the manufacturer is not responsible for accounting for every conceivable foreseeable use. It is foreseeable that a consumer might use a soft drink bottle for a hammer, might attempt to drive his automobile across water or might pour perfume on a candle to scent it. If he does, however, the manufacturer of the product should not be and under the LPLA is not liable because the uses in the illustrations are not the sort that a manufacturer should reasonably expect of an ordinary consumer. (Emphasis added.)
In the instant case, plaintiffs based their claims on two theories of liability under the LPLA: that the chair was unreasonably dangerous *776 in design and unreasonably dangerous because an adequate warning was not provided.
LSA-R.S. 9:2800.56 provides that a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:[7]
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
LSA-R.S. 9:2800.57 sets forth the circumstances under which a product is unreasonably dangerous because of an inadequate warning:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
The LPLA defines "adequate warning" in LSA-R.S. 9:2800.53(9) as follows:
[A] warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.
In the instant case, the evidence consists of the testimony of Carole Myers, two of Myers's co-workers, officials of American Seating, and various expert witnesses.
Carole Myers testified that, on the day of the accident, she went into the teacher's smoking room/storage room to get a jar of pickles for the school's "pickle day." According to Myers, she entered the room and noticed that there were newspapers lying on the table. Because the school was involved in a recycling project, she picked up the papers, folded them, and was going to place them on a ledge in the room. In order to reach the ledge, Myers stepped onto the chair, when suddenly it folded, causing her leg to slip through the opening. Myers stated that she did not examine the chair or think about the chair prior to stepping onto it. She stated that she knew the chair was a folding chair and acknowledged that she "definitely was wrong by standing on [the] chair." Myers indicated that there was a stepladder available in the school and that she had used the stepladder on prior occasions. *777 Myers testified that, ten months after the accident, she went to Winbourne Elementary and retrieved two chairs from the smoking room, one of which had a "W" inscribed underneath the seat. Myers denied having told anyone that she took two chairs because she was uncertain which one she had stepped on. Myers stated that the chair which caused her accident had a "W" underneath the seat, but acknowledged that there were many folding chairs at Winbourne Elementary with a "W" underneath the seat.
Andrew McPhate, plaintiffs' expert in mechanical engineering, testified that the 54-folder is unreasonably dangerous because, if weight is placed on the chair behind the pivot point of the seat, the chair will fold up. McPhate indicated that, prior to April of 1955 (when American Seating began manufacturing the 54-folders), there were alternative designs available in the industry which would have eliminated the jackknifing problem.[8] McPhate testified that, because American Seating manufactured approximately five million of the 54-folders, there was a likelihood that sooner or later someone would stand on a chair and get injured. However, McPhate acknowledged that had Myers used precaution and not stood on the chair, the accident would not have occurred. He then stated that it was unreasonable for a person to climb onto a folding chair because there is a calculated risk involved in doing so. McPhate had no personal knowledge that anyone other than Myers had been injured while using a 54-folder.
George Evans, production engineer for American Seating for twenty-seven years, testified that, as an engineer, he could anticipate that a person would step on the front of the seat of a folding chair. However, he stated that there was "very little likelihood" that a person would step on the back of the seat, noting that "it was not the proper thing to do under any circumstances." He acknowledged that American Seating's brochure suggested that the chair was sturdy enough to use as a stepladder, but stated that the advertising department printed the statement in the brochure merely to sell the product.[9] Moreover, he indicated that the average user should know better than to stand on a folding chair. Evans indicated that American Seating had not placed warnings on the chairs because "common sense" tells a person not to stand on folding chairs, and he stated that there is no need "to warn about the obvious." Evans stated that, although American Seating had manufactured five million of the 54-folders, he knew of only one other accident involving one of the chairs and was uncertain whether the chair had folded or tipped over. He indicated further that he knew of no other lawsuit concerning an American Seating folding chair.
Kenneth Childs testified that he had been employed as Director of Labor Relations for American Seating from 1954 to 1980 when he became part-time special counsel for American Seating. During his thirteen years as special counsel, Childs indicated that he monitored products liability suits against American Seating and that Myers's accident was the only accident involving an American Seating folding chair.
Walter Nordmark's deposition testimony reveals that he worked in research and development for American Seating for thirty-eight years, beginning in 1935, and that he was involved in the design of folding chairs. Nordmark acknowledged that he designed patent number 2,654,419 for American Seating, in an effort to eliminate the jackknifing problem, which was an industry-wide recognized problem. Nordmark explained that jackknifing occurs only when weight is applied to the back of the seat. Nordmark testified that, when he left American Seating in 1974, the company had not yet manufactured *778 an anti-jackknifing chair, despite the fact that there were patents available providing such designs. However, he also indicated that there were many other manufacturers producing similar chairs without anti-jackknifing components at the time. According to Nordmark, American Seating had never been sued for any problems arising from the use of its chairs.
Bruce Donnell was admitted at trial as an expert in structures, equipment design, and failure analysis. Prior to trial, Donnell examined approximately two thousand folding chairs and tested 54-folders against other designs. Donnell's tests revealed that a 54-folder would jackknife if a twelve-pound load was placed on the rear of the seat. Donnell opined that American Seating knew that people would stand on the chairs and also knew that the chairs would jackknife if used in that manner. He based his opinion on American Seating product literature which indicated that American Seating felt that its chair would withstand the abuse of using it as a stepladder. Donnell also stated that American Seating had access to anti-jackknifing designs prior to its manufacture of the 54-folder. However, he acknowledged that, despite the availability of patents with anti-jackknifing designs, other manufacturers were still manufacturing folding chairs without the anti-jackknifing component. Donnell stated that American Seating later began manufacturing a non-jackknifing folding chair.
Donnell indicated that the difference between the jackknifing and non-jackknifing chairs is not obvious to the general public. He also stated that the utility of the anti-jackknifing design was no different from the utility of the 54-folder and that, from a manufacturing standpoint, the 54-folder had no benefit. According to Donnell, the 54-folder was the most dangerous chair that he found on the market. However, Donnell acknowledged that there is no evidence that a lawsuit had ever been filed against American Seating in connection with someone standing on a folding chair.
Willie J. Porter, head custodian at Winbourne Elementary, testified that he was aware that standing on the rear of a folding chair was dangerous and might cause it to jackknife. He stated that, on one occasion, he attempted to stand on the rear of the seat of a folding chair, but immediately realized that it was going to fold and removed his foot from the chair without being injured. Porter stated that, ten months after the accident, he accompanied Myers to the smoking room and that she retrieved two chairs. Porter indicated that he assumed Myers did not know which of the chairs she had stepped on because she took two chairs from the lounge.
Barbara Brownfield, principal at Winbourne for fourteen years, testified that, although she had stood on folding chairs in the past, she never experienced a chair tipping over or folding. However, she indicated that she knew to stand carefully on a folding chair and stated that she always stood on the front of the seat.
After reviewing all of the evidence, the trial court determined that the Myerses had not shown the chair to be unreasonably dangerous in accordance with the LPLA under either the design theory or the inadequate warning theory. Additionally, the trial judge found that Myers's damage did not arise from a "reasonably anticipated use" of the chair. Based on these findings, the trial court concluded that the facts and inferences were so overwhelmingly in favor of American Seating that reasonable people could not reach a contrary verdict and granted American Seating's motion for directed verdict.
After reviewing the entire record, we conclude that, based on the evidence presented to the jury, reasonable people could have reached a different conclusion. Therefore, the trial court erred in granting American Seating's motion for directed verdict. However, our inquiry does not end here.
Instead of remanding this matter to the trial court, we will decide de novo the liability of American Seating under the LPLA. In Gonzales v. Xerox Corporation, 320 So.2d 163, 165-66 (La.1975), the Louisiana Supreme Court addressed de novo review of the merits by appellate courts:
While the trial court remains the original forum for resolving factual and legal issues, the Louisiana Constitution expressly *779 extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law....
In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.
See also Temple v. Liberty Mutual Insurance Company, 330 So.2d 891, 892 (La.1976); McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993); Mathews v. Mathews, 614 So.2d 1287, 1291 (La. App. 2nd Cir.1993); Gray v. Texaco, Inc., 610 So.2d 1090, 1094 (La.App. 3rd Cir.1992), writs denied, 616 So.2d 686, 687 (La.1993).
We have thoroughly reviewed the merits of this matter using a de novo standard of review. Although we found that the trial court erred in granting the directed verdict because the evidence was not so overwhelmingly in favor of American Seating that reasonable minds could not have reached a different result, based upon the evidence of record, we find that the Myerses failed to prove, by a preponderance of the evidence, that the chair was unreasonably dangerous in design or because of an inadequate warming. The evidence shows that, in a reasonably anticipated use, the 54-folder performed in the manner a folding chair should perform. Only when used in the manner Carole Myers used the chair, namely standing on the rear portion of the chair seat, would the chair jackknife. Although this use may be a conceivable use, it is not a reasonably anticipated use. Most people who use a folding chair as a stepladder utilize the front portion of the seat upon which to stand. Moreover, of the more than five million 54-folders manufactured by American Seating, only one other incident occurred involving a folding chair. Finally, the evidence also showed that, any danger presented by standing on a folding chair is an obvious danger to a reasonable person. Therefore, we find that the Myerses failed to establish that American Seating was liable under the LPLA.[10]

CONCLUSION
For the foregoing reasons, the judgment of the trial court granting American Seating's motion for directed verdict is reversed and set aside.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of American Seating, and against the Myerses, dismissing the Myerses' and the School Board's claims. All costs of the trial court and this appeal are assessed equally against the Myerses and the School Board.
JUDGMENT GRANTING DIRECTED VERDICT REVERSED. JUDGMENT RENDERED IN FAVOR OF DEFENDANTS DISMISSING PLAINTIFFS' CLAIMS.
NOTES
[1] MISSCO Corporation of Jackson, Inc. was erroneously named in the Myerses' supplemental and amending petition as Interstate School Supplies d/b/a Interstate Companies of Louisiana.

On May 20, 1992, the Myerses filed a partial motion to dismiss the claims against MISSCO, Interstate School Supplies, Interstate Companies of Louisiana, and Interstate School Supply Company, Inc., without prejudice. These parties were dismissed by order dated May 27, 1992.
[2] On January 15, 1993, a judgment was signed, dismissing the Myerses' claims against St. Paul Fire and Marine Insurance Company without prejudice.
[3] On March 28, 1993, the trial judge signed a judgment, noting that he would later sign a judgment filed by plaintiff with minor alterations as to form.
[4] The proffered evidence indicates that Dexter stated that, at one time, American Seating had provided warning labels on some of its chairs.
[5] LSA-C.E. art. 705 provides, in pertinent part, as follows:

In a civil case, the expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
[6] John Kennedy, along with Professor H. Alston Johnson, III, drafted the LPLA.
[7] The parties stipulated that the chair's condition, other than ordinary wear and tear, was essentially the same as when the chair left American Seating's control.
[8] The plaintiffs introduced into evidence several patents which had been filed prior to 1955.
[9] American Seating's brochure states as follows:

From the standpoint of comfort, it is important that the pitch of the seat should not vary, even under the abuse of using the chair for a step ladder. In normal use, the load is applied to the seat above or to the rear of the hinge point. Loads applied near the front edge of the seat will often cause failure or excessive permanent set in the seat arms. We have found that in order to give satisfactory service in use, that a load of 700 pounds applied 6" from the front edge of the seat, should not cause weld or structural failures, or a permanent deflection of over ¼" in the seat.
[10] Because we have found that the Myerses failed to prove that the chair was unreasonably dangerous under the LPLA, the School Board is not entitled to recover worker's compensation benefits paid to Myers.