UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-40822
_____

ILENE THURMAN HUNTER, obo Kathy Michelle Hunter,
Claude Kenneth Hunter, Jr., Michael Christopher Hunter, and
Melissa Ilene Hunter, and Donnovan Blaine Hunter,

Plaintiffs-Appellants-
Cross-Appellees,

versus

KNOLL RIG & EQUIPMENT MANUFACTURING CO. LTD.,
A Subsidiary of Draco Group of Companies,
Ltd., Et Al.,

Defendants-Appellees-
Cross-Appellants.

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

November 29, 1995

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In this Louisiana wrongful death products liability action against a manufacturer, and arising out of a drilling rig accident, the principal issue at hand is whether, under the Louisiana Products Liability Act, the claimed unreasonably dangerous product was being used (handled) in a manner that the manufacturer, at the time of manufacture, should reasonably expect (reasonably anticipated use). The Hunters appeal the apportionment by the district court of damages against defendant Knoll Rig & Equipment Manufacturing Co., Ltd. (KREMCO); it cross-appeals, contending that, *inter alia*, the product (drilling rig racking board) was not

being handled in a reasonably anticipated manner at the time of the accident. Because we conclude that, based on this issue, KREMCO was entitled to judgment as a matter of law, we **REVERSE** and **RENDER**.

I.

In 1981, KREMCO, a Canadian drilling rig manufacturer, sold one of its rigs to R. L. Long Co.; one component was the racking board in issue. Long modified the rig and racking board to suit customer preferences. Long sold the modified rig, with the racking board, to Hunter's employer, Mosley Well Service, in 1984. Claude Kenneth Hunter was crushed fatally by falling pipes while he worked in August 1990 as a derrickman for Mosley on a drilling operation. Hunter was positioned on the racking board, which was attached, approximately 50 feet above the ground, to the mast of the drilling rig. The mast, often referred to as a "derrick", was raised to a near-vertical position at the drilling site.

The frame of the racking board in issue was rectangular, with one of the shorter sides being partly open; that open end was closest to the derrick. Handrails enclosed the two long sides and the other short side. As hereinafter described, the top ends of drilling pipes are brought into the racking board through the open end. Inside the frame of the racking board is a platform, or "diving board", on which the derrickman stands; it is attached to the middle of the back frame of the racking board and runs parallel to its long sides. On an end-racked racking board, such as the one involved here, there are fingers on each side of, and parallel to, the diving board; they point toward the mast. On the racking

board, there were five fingers to the left of the diving board and seven to the right, between which the drilling pipes were to be racked (inserted). As manufactured, the racking board did not have chains or other restraining devices to assist in preventing the pipes from falling across the mast if they began to lean too much in that direction.

The back and side handrails of the KREMCO racking board were modified by another entity subsequent to sale by KREMCO. When the original KREMCO back handrail was raised to the upright position, it jutted up against the side handrails. The back handrail was secured to the side handrails with heavy-duty pins inserted through the "ears" at an angle vertical to the ground. This design was modified by removing the ears and attaching a latch on each end to secure the back handrail. It was these latches that failed, allowing the handrail to come forward and the pipes tied to it to fall across the mast, crushing Hunter.

A derrickman racks stands of pipe, which are about 55-60 feet in length, as they are removed from the drilling hole. When workers on the ground remove the pipe, the derrickman maneuvers the top of the pipe between the racking board fingers, and leans it against the bottom back frame of the racking board. A crew member on the ground positions the bottom end of the pipe at ground level. The pipe is leaned away from the mast in a "positive lean", as is the industry standard, and should be supported by the back frame of the racking board. Leaning the pipe toward the mast, in a

"negative lean", is dangerous, because the pipe could fall toward the mast.

On an end-racked racking board, one pipe after another is racked in a row from the back to the front of the racking board. As stated, the derrickman and workers on the ground must ensure that the pipes maintain a positive lean (away from the derrick and toward the back of the racking board). At the time of the accident, Hunter had racked approximately 143 stands of pipe, weighing approximately 110,000 pounds. Due to the large number of pipes that had to be racked, the rig workers were concerned that all of the pipes would not fit into the racking board; accordingly, in an effort to fit more pipes, they did not give them much positive lean. In fact, the pipes were given only about three to four inches of positive lean, whereas normally the lean should be approximately 12 to 20 inches from the vertical, which is somewhere in the neighborhood of one to two degrees.

In racking the pipes, Hunter tied the first pipe in each row to the back handrail of the racking board with a sashcord, and then tied each successive pipe in each row to the previous pipe. As noted, when Hunter began racking the pipes, they were leaned away from the mast (positive lean). However, because the pipes being racked were larger at the top than at the bottom, and because the initial positive lean was not great enough, the pipes leaned less and less toward the back of the racking board as more and more pipes were racked, until the pipes were vertical and then leaning toward the mast.

In industry terms, "the pipes grew"; when this occurs, the workers on the ground should "kick out" the bottom ends of the pipes, so that they do not lean toward the mast (negative lean). Due to his vantage point, the derrickman (Hunter) is the first person who would detect a negative lean; it is his responsibility to notify the workers on the ground that the bottoms of the pipes need to be moved ("kicked out").

Because the pipes were tied to the back handrail,[1] when the pull from the negative lean of the pipes became too great, the latches failed, allowing the back handrail and pipes to fall toward the mast. In the accident, no part of the racking board manufactured by KREMCO failed. Only the latches failed; but, as noted, they had been installed by an entity other than KREMCO.

After this action was filed against KREMCO in 1991 in Louisiana state court under the Louisiana Products Liability Act, LA. REV. STAT. ANN. § 9:2800.51, *et seq*. (LPLA), KREMCO removed it to district court based on diversity jurisdiction. The parties consented to trial before a magistrate judge; and, following five days of testimony, the jury returned a verdict for the Hunters. It found: (1) the racking board was unreasonably dangerous when it left KREMCO's control; (2) Hunter's death was caused by an unreasonably dangerous characteristic of the racking board during

---

[1] According to testimony, tying pipes to the back handrail is a misuse of the racking board, because that rail is designed only to support the weight of the derrickman should he fall. In fact, the derrickman's safety wire is attached to that handrail. According to the testimony, however, pipes are often tied to the back handrail.

a reasonably anticipated use; (3) Hunter's death was caused also by his negligence; (4) the latches were unreasonably dangerous; (5) Hunter's death was caused also by an unreasonably dangerous characteristic of the latches; (6) Long caused the latches to be unreasonably dangerous; (7) Mosley Well Service did not cause any unreasonably dangerous characteristic of the latches; and (8) Hunter's death was caused also by the negligence of Mosley Well Service employees. The jury assessed fault as follows: KREMCO 30%, Hunter 5%, Long 30%, and Mosley 35%.[2]

Post-verdict, the district court found that Long is insolvent and that the Hunters had not received any compensation from Long. Of the stipulated damages of approximately $1.3 million, the court assessed approximately $652,000 against KREMCO. As it had at the close of the Hunters' case and of all the evidence, KREMCO moved for judgment as a matter of law on, *inter alia*, whether the

---

[2] The dissent implies, incorrectly, that this opinion is based on the proposition that the comparative fault of other parties insulates KREMCO from its own fault. While some pre-LPLA cases have been criticized for going so far under the pre-LPLA standard of "normal use" as to treat product misuse as a defense the manufacturer had to prove, rather than something the plaintiff had to prove did not occur (*see e.g. **Bell v. Jet Wheel Blast***, 462 So.2d 166, 172 (La. 1985)), the new LPLA standard of "reasonably anticipated use" is narrower in scope and does not include reasonably foreseeable misuse, as discussed *infra*. ***Daigle v. Audi of America, Inc.***, 598 So.2d 1304, 1307 (La. App. 3d Cir. 1992); ***Lockart v. Kobe Steel Ltd. Const. Mach. Div.***, 989 F.2d 864, 867 (5th Cir. 1993); John Kennedy, ***A Primer on the Louisiana Products Liability Act***, 49 LA. L. REV. 565, 584-86 (1989) (explaining that the LPLA standard of "reasonably anticipated use" is more narrow than the prior "normal use" standard and, *inter alia*, does not include product misuse) (Kennedy was a co-drafter of the LPLA.). We recognize that there may well be inherent conflicts between liability under the LPLA and comparative fault. The parties do not raise this issue, however, and we do not reach it.

accident occurred, as required by LPLA, during a "reasonably anticipated use" of the racking board.  The motion was denied.

## II.

For this diversity action, the parties do not dispute that Louisiana law controls.  *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938).  The threshold issue is whether the manner in which the racking board was used when the accident occurred was "reasonably anticipated" by KREMCO at the time of manufacture.[3]

The LPLA provides that

> [t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

LA. REV. STAT. ANN. § 9:2800.54(A).  Of critical importance here, "reasonably anticipated use" is defined as "a use or *handling* of a product that the product's manufacturer should reasonably *expect* of an ordinary person in the same or similar circumstances."  LA. REV. STAT. ANN. § 9:2800.53(7) (emphasis added).  Accordingly, KREMCO can be liable only if the particular use (negative lean) of the racking board was "reasonably anticipated" by it; and, if it was not, we do not reach whether the racking board was unreasonably dangerous because, for example, it did not have a chain, or chains, across

---

[3]    Because we conclude that the manner in which the pipes were racked was not a "reasonably anticipated use", we need not reach the other issues presented, including whether the design of the racking board was unreasonably dangerous, whether KREMCO breached an express warranty, and whether liability and damages were apportioned properly.

the open end.  *Lockart v. Kobe Steel Ltd. Const. Mach. Div.*, 989 F.2d 864, 867 (5th Cir. 1993).

In *Lockart*, a products liability action was filed against the manufacturer of an excavator.  Two workers had suspended a pontoon by looping a chain around the teeth of the excavator's bucket, but the chain slipped off the bucket and the pontoon fell, killing one worker and injuring the other.  Our court upheld summary judgment, because using the excavator to suspend the pontoon was not "reasonably anticipated" within the meaning of the LPLA.  The court rejected the idea that a warning in the operator's manual not to hang objects from the bucket was evidence that the manufacturer had reasonably anticipated that the excavator would be used in that manner.

The fact that there were warnings on the product in *Lockart* does not distinguish it from the Hunters' case:

> Even if the warning did not reach the users, the LPLA speaks of "an ordinary person in [the] same or similar circumstances".  These users had many years experience mining and working with heavy machinery, and both had taken company courses in equipment handling in 1986.  The dangers of using the bucket to suspend a heavy pontoon should have been obvious to the ordinary consumer and certainly to experienced workers.

*Lockart*, 989 F.2d at 868 (footnote omitted).[4]  This was consistent with the dictates of the LPLA:

> A manufacturer is not required to provide an adequate warning about his product when: ... The user or handler of the product already

---

[4]    In an attempt to distinguish *Lockart*, the dissent appears, erroneously, to rely in part on the warning.

> knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

LA. REV. STAT. ANN. § 9:2800.57(B)(2); *see, e.g., **Morgan v. Gaylord Container Corp.***, 30 F.3d 586, 591 (5th Cir. 1994).

In noting that the LPLA standard for reasonably anticipated use (defined in the previously quoted § 9:2800.53(7)) is more stringent than the pre-LPLA standard, **Lockart**, 989 F.2d at 867, cited **Daigle v. Audi of America, Inc.**, 598 So.2d 1304, 1307 (La. App. 3d Cir. 1992), which recognized that "[t]his definition is narrower in scope than its pre-LPLA counterpart, 'normal use', which included all reasonably foreseeable uses and misuses of the product." As stated in **Lockart**, "[t]his more restrictive scope of liability was to avoid prior confusion and because virtually any conceivable use is foreseeable". 989 F.2d at 867.

To illustrate the meaning of "reasonably anticipated use", **Daigle** gives the following examples of what uses a manufacturer should not reasonably expect of an ordinary person:

> "Reasonably anticipated use" ... convey[s] the important message that the manufacturer is not responsible for accounting for every conceivable foreseeable use. It is foreseeable that a consumer might use a soft drink bottle for a hammer, might attempt to drive his automobile across water or might pour perfume on a candle to scent it. If he does, however, the manufacturer of the product should not be and under the LPLA is not liable because the uses in the illustrations are not the sort that a manufacturer should reasonably expect of an ordinary consumer.

598 So.2d at 1307 (*quoting* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565, 586 (1989)) (Kennedy was

- 9 -

a co-drafter of the LPLA.).  Similarly, in **Myers v. American Seating Co.**, 637 So.2d 771 (La. App. 1 Cir. 1994), the plaintiff was injured when a folding chair jackknifed while she was standing on the rear portion of it.  The court denied manufacturer liability:

> Although this use may be a conceivable use, it is not a reasonably anticipated use.  Most people who use a folding chair as a stepladder utilize the front portion of the seat upon which to stand....  [A]ny danger presented by standing on a folding chair is an obvious danger to a reasonable person.

**Myers**, 637 So.2d at 779.

Another example is **London v. MAC Corp. of America**, 44 F.3d 316 (5th Cir. 1995), in which a worker fell while standing on the gearbox cover to reach material in a shredder.  Pursuant to the LPLA, our court affirmed judgment as a matter of law at the close of the case for the manufacturer because, "although the use of the gearbox cover as a work station may be conceivable, [the manufacturer] could not reasonably anticipate its use in this fashion".  44 F.3d at 319.  Finally, **Delphen v. Dep't of Transp. & Dev.**, 657 So.2d 328 (La. App. 4th Cir. 1995) concerned, *inter alia*, a bicycle manufacturer sued under the LPLA when a quick release allowed the front wheel to separate from the bicycle.  In reversing a jury verdict against the manufacturer, the court held:

> Danger imposed by the wheel would have been obvious to a reasonable person who would recognize that the bicycle was a specialized product for sophisticated users, and the ordinary person should inquire into the proper manner of fastening the quick release mechanism before using the bicycle again. Considering the obvious danger posed by the

- 10 -

> sophisticated bicycle, the fact that [the plaintiff] rode the bicycle across [a] drawbridge without obtaining additional instructions regarding the bicycle's proper use and knowing that the wheel previously had become loose, was not a reasonably anticipated use of the product.

*Delphen*, 657 So.2d at 333-34.

Likewise, while it is conceivably foreseeable that rig workers might lean pipes toward the mast so they may fall, at issue is whether, under § 9:2800.53(7), this is the type use that a manufacturer of a racking board "should reasonably expect of an ordinary person in the same or similar circumstances". Restated, the Hunters had the burden of proving that, at the time of manufacture, KREMCO "should [have] reasonably expect[ed] ... [that] an ordinary" user of the racking board would lean the pipes toward the mast as was done the night of the accident. *Lockart*, 989 F.2d at 869.

The well-known standard for judgment as a matter of law is found in FED. R. CIV. P. 50, as defined more fully by *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc). *See United States Fire Ins. Co. v. Confederate Air Force*, 16 F.3d 88, 91 (5th Cir. 1994). Rule 50(a)(1) provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim ... that cannot under the controlling law be maintained ... without a favorable finding on that issue.

- 11 -

And, *Boeing*, 411 F.2d at 37, states:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the [motion] is proper. On the other hand, if there is substantial evidence opposed to the [motion], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the [motion] should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.

As stated, at issue is whether the manner in which the pipes were leaned was, to KREMCO at the time of manufacture, a reasonably anticipated ("should [have been] reasonably expect[ed]") use by "an ordinary person in the same or similar circumstances". LA. REV. STAT. ANN. §§ 9:2800.54(A), .53(7). Based on our review of the record, we conclude that this particular use was not reasonably anticipated.

At the time of manufacture, KREMCO was aware of the possibility of negative lean and the attendant risk.[5] Likewise,

---

[5] Gerald Knoll, the founder of KREMCO, knew at the time the racking board was manufactured that, if pipes were not racked with enough positive lean, they would fall toward the mast. However, Knoll testified that if you start with a proper positive lean, you will "never ... have [the] problem" of pipes growing enough at the top to produce a negative lean; and that "we felt that we were selling to knowledgeable users and that [it] would be the responsibility of the end user to come up with the procedure" for racking the pipe. According to Knoll, KREMCO didn't make any assumptions when it built the racking boards as to how the end user would use them. He testified that he does not think that the manufacturer had a duty to advise the public as to the proper way to use the equipment; that, at the time, KREMCO did not have any information or knowledge about how pipe would be secured in the derrick; and that, although a Canadian regulation instructed that tubes should be secured at the top by

Danny Ray (rig operator), Charles Berry (rig operator), and Kenneth Willoughby (derrickhand), testified that there are times when 3 1/2 inch pipe (used at the time of the accident) starts to lean toward the mast if a large number of that type are placed in the racking board. In addition, both Tommy Prince (floorhand and derrickman) and Ray testified that they had seen this type pipe racked with a sashcord tied to the rear handrail to secure the pipe.

But, while it may be common for this type pipe to have a tendency to grow at the top (lean toward the mast), these witnesses testified that the common practice is that, once the pipes do start to lean, the negative lean is corrected. Their testimony indicates that it is not reasonable, but instead is dangerous and against industry practice, to allow a negative lean to subsist.[6]

_____

means of tie-back ropes or an equivalent device to prevent them from falling out of, or across, the derrick, that statement was directed toward the operator or employer, not the manufacturer.

[6]     Ray testified that "[j]ust about any time you trip pipe ... it mushrooms at the top. Kind of flares out. Gets bigger." The dissent erroneously draws the conclusion from Ray's testimony that a negative lean is common. Although Ray testified that he had seen pipes racked as depicted in a diagram presented by the Hunters' counsel, Ray could not tell how much those pipes were leaning. Ray testified that if a negative lean occurs, you then "space out the bottom some and it will throw some lean back in once the pipe starts getting too much on you"; that if the lean gets too much toward the mast "that's when you would start your next row"; that you don't want the pipes to lean toward the mast because you don't want them to fall into it; that "you always want the pipe to go to the back". It is unreasonable to conclude from Ray's testimony that a negative lean is commonplace. Ray testified that a negative lean is something you would be worried about and that it is the job of the derrickman to notify people on the ground if there is a problem with the pipes leaning toward the mast.

Berry testified that the normal practice for Mosley and other companies in the industry is to lean the pipes away from

- 13 -

Contrary to the Hunters' assertion, the evidence does not

_____

the mast, and that this is the safe practice so the pipes will stay in the racking fingers.  The dissent states that Berry confirmed that pipes are always tied to the handrails.  While Berry testified that he tied pipes to the side or back handrail every time, he neither testified that pipes were always tied to the back handrail, nor that tying negatively leaning pipes to the back handrail was a common or safe practice.  And, contrary to the dissent, Berry never described a negative lean as commonplace.  He testified that the idea is to have the pipes lean away from the mast, and that you try to lean the pipes away from the mast enough so that when all the pipes are racked, they will still be leaning toward the back of the racking board; that, if you lean pipes toward the mast, you encounter problems.  Though Berry testified that there are times when the weight of the pipes gets too much toward the mast, he testified that, if there was trouble with the pipes leaning toward the mast, he would kick the pipes out at the bottom to prevent a negative lean.  Berry confirmed that it would concern him if the pipes started leaning toward the mast, because it is not safe.  He testified that it was Hunter's responsibility as derrickman to notify people on the ground of a negative lean so they could kick out the pipes.

Willoughby testified that, according to Mosley's practice, and the practice in the industry, you do not lean pipes toward the mast during the racking process.  He testified that anybody with years of experience in the oilfield would know that it is not a safe practice to let pipes lean toward the mast and tie them that way.  Willoughby testified that even when pipes are racked all the way to the end of the finger, the pipes should still be leaning away from the mast.  He confirmed that the derrickman should notify the people on the ground if the pipes are leaning toward the mast, so the ground crew can either remedy the problem or stop racking.  According to Willoughby, the derrickman is the first one to know there is a problem with the lean of the pipes, and he ought to do something to take care of it.  Willoughby verified that the only two times when Mosley Well Service has had a pipe swarming incident (the accident in issue and an earlier occasion) is when the pipes were leaning toward the mast.

Although Prince testified that he had seen pipes secured with sashcord on a number of occasions, he did not testify that it was common to lean pipes toward the mast.  Prince asserted that Smith (the toolpusher) and Berry (the rig operator) were worried about the lean of the pipes on the night of the accident. He admitted that it is the responsibility of the derrickman to notify the people on the ground if there is a problem with the lean.

allow a reasonable juror to find that leaning the pipes toward the mast was a common occurrence. Kenneth Kaigler, who had worked in the field for over 40 years, testified for the Hunters as an expert in the field of rig operations and safety. When asked if he had "ever seen pipe with a negative lean ... in the racking board", he replied: "... [M]aybe a half a dozen times, not very often. It's not a common deal, but I have seen it." In short, a reasonable juror could not conclude from Kaigler's testimony that a negative lean was a common occurrence.[7]

Testimony, in fact, indicates that the lean at the time of the accident was obviously dangerous.[8] Eric Beavers, who was the floorhand on the rig when the accident occurred and was handling

---

[7]    The dissent concedes that Kaigler, the Hunters' own expert witness, testified that negatively leaning pipe was "not common". In determining whether the manufacturer at the time of manufacture should have reasonably expected the dangerous negative lean, Kaigler's expert testimony is of far greater importance than that of the rig workers (who, as the dissent admits, negligently failed to correct the negative lean). Even assuming that Ray and Berry thought that leaning pipes negatively was common, the outcome of the case is no different, because, obviously, "reasonably anticipated use", as applied to KREMCO, is an objective standard. *Daigle*, 598 So.2d at 1307; *Lockart*, 989 F.2d at 867. In other words, what Ray and Berry thought is of little, if any, import; the question is whether, at the time of manufacture, KREMCO reasonably anticipated (objective standard) that the pipes would be leaned toward the mast in a dangerous manner. Restated, the testimony by Ray and Berry is not a basis for determining whether the objective standard is satisfied. No reasonable juror could have found under an objective standard that KREMCO reasonably anticipated when it manufactured the racking board that pipes would be racked with the dangerous negative lean present in this case.

[8]    Contrary to the dissent's assertion, we do not seize upon the existence of a mere negative lean. While this type of pipe may have a tendency to lean toward the mast, it was not reasonably anticipated that pipes would be racked with an obviously dangerous negative lean.

the bottom of the pipes, testified that the toolpusher was "raising hell" because the lean of the pipes "was ridiculous".[9]  Beavers testified that the toolpusher "ought to have been griping" because the pipes were leaning to the degree that it was dangerous.

The danger of allowing the pipes to lean toward the mast so that they might fall should have been obvious to the ordinary user of racking boards.  (This was certainly obvious to the experienced workers at Mosley Well Service.  *See* **Lockart**, 989 F.2d at 868.  As shown by their testimony, the Mosley employees knew that it was dangerous, and certainly not the industry practice, to allow the pipes to have negative lean.  Furthermore, as noted, Mosley had had a swarming incident prior to the accident in issue.  *See* **Delphen**, 657 So.2d at 333-34.)  In light of the unreasonable lean toward the mast, the manner in which the racking board was used was not a reasonably anticipated use.[10]

In sum, the LPLA imposes manufacturer liability only if the accident occurred during a reasonably *anticipated* (manufacturer should have reasonably expected) use, not a reasonably *foreseeable* use or misuse.  **Daigle**, 598 So.2d at 1307; **Lockart**, 989 F.2d at 867

---

[9]    Beavers died before trial.  Counsel attempted to clarify whether Beavers' deposition testimony was that the lean was "ridiculous" or "dangerous", but the clarification only creates more confusion.  This distinction is immaterial; for our purposes, both words convey the same meaning.

[10]    Expert witness Howard Elwell, Jr., testified that a design by a different manufacturer that incorporated chains in the design "provided insight into the manufacturer's knowledge about pipe-swarming problems and how to control them".  But, a reasonable juror could not conclude that the existence of such designs shows that it was reasonably anticipated that pipes would be racked with a negative lean.

(citing *Daigle*). There is no evidence that it was reasonably anticipated that the pipes would be racked with such a dangerous lean toward the mast.[11] A reasonable juror could not have arrived at a contrary conclusion. Therefore, judgment as a matter of law for KREMCO was compelled.

### III.

For the foregoing reasons, the judgment is **REVERSED** and judgment is **RENDERED** in favor of Knoll Rig & Equipment Manufacturing Co., Ltd.

**REVERSED** and **RENDERED**

BENAVIDES, Circuit Judge, dissenting:

The majority reviews the evidence and concludes that the manner in which the racking board was used was not a "reasonable anticipated use." But because there is evidence from which a reasonable jury could conclude otherwise, I am compelled to dissent.

In reviewing a jury verdict, our standard is clear: we must view all of the evidence in favor of the prevailing party.

---

[11] Despite the dissent's concern that we do, we do not lose sight of the fact that the standard for reviewing a jury verdict under *Boeing* and subsequent cases is very high; but, on the other hand, we are compelled under *Boeing* to reverse the jury when no reasonable juror could have found that, at the time of manufacture, KREMCO reasonably anticipated the dangerous use to which the racking board was put. It is true, as the dissent states, that the jury could have found the testimony of Ray and Berry credible; however, this is irrelevant because, as noted, nothing in their testimony supports that racking the pipe with the dangerous negative lean present in this case is common or was a reasonably anticipated use of the racking board.

Weighing the conflicting evidence and the inferences to be drawn from it is the province of the jury; its decision must be accepted if the record contains any competent and substantial evidence tending to support the verdict. <u>Gann v. Fruehauf Corp.</u>, 52 F.3d 1320, 1326 (5th Cir. 1995); <u>Knowlton v. Greenwood Indep. Sch. Dist.</u>, 957 F.2d 1172, 1178 (5th Cir. 1992). "If there is an evidentiary basis upon which the verdict can be supported, the jury's determinations will be left undisturbed, even where there is substantial contradictory evidence that could have supported an opposite verdict." <u>Gibraltar Sav. v. LDBrinkman Corp.</u>, 860 F.2d 1275, 1297 (5th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1091 (1989), <u>accord</u> <u>Knowlton</u>, 957 F.2d at 1178. I believe the majority loses sight of this standard.

The majority opinion accurately reflects the events surrounding this drilling rig accident. While acting as derrickman, Hunter was maneuvering pipe into a racking board. The floorhands positioned the pipe at ground level. It is undisputed that the pipes were initially given positive lean, albeit less than desirable. Hunter tied the pipe to the back handrail of the racking board with sashcord which, as the majority notes, is common. As each successive pipe was tied to the previous one, the pipes grew at the top creating a negative lean. The latches on the back handrail failed; the pipes crashed forward; Hunter was killed.

In absolving KREMCO of liability, the majority seizes upon the existence of negative lean and uses it to craft an exclusion from "reasonably anticipated use." In doing so, it usurps the function of the jury and Hunter's right to the jury's decision. In its

answer to jury question two, the jury found that Hunter's death was caused by an unreasonably dangerous characteristic of the racking board during a reasonably anticipated use. Given our standard of review, we must uphold this verdict if there exists evidence in the record to support that conclusion, even if there is substantial evidence to the contrary. In this case, there is evidence that both negative lean itself is common and the overall use of the racking board was routine.

At trial, rig operator Danny Ray testified that pipe is always tied to the back handrail. Ray examined a diagram showing negative leaning pipe and testified as follows:

> Q: In looking at this diagram, Mr. Ray, in looking at the way this pipe is racked, is this something that is common to you or at least seen by you out there in your work as an oil well service operator?
>
> A: Yes, sir. Just about any time you trip pipe it always--it's tight at the bottom, but as you (sic) collars butt up against one another you're coming out of it, it mushrooms at the top. Kind of flares out. Gets bigger.[12]

On cross examination, in direct response to whether it is common practice to lean pipe toward the mast, Ray testified: "You have to kind of do it the way you--to get the job done, you know? Not all wells are perfect and you just kind of gotta do the job the best you can. If you're tripping 12 or 14 thousand foot of pipe and you can space out the bottom some and it will throw some lean back in

---

[12] The majority argues that because Ray could not quantify the degree of negative lean in the diagram that no reasonable jury could credit this testimony. The majority does not, however, deny that the diagram does illustrate negative leaning pipe and that the diagram, Plaintiff's Exhibit 29.16, was introduced into evidence and was before the jury.

it once the pipe starts getting too much on you."  Further, on redirect Ray was asked: "You have racked pipe with it leaning towards the mast before, haven't you?"  Ray responded, "yes, sir, I have."[13]

In addition to Ray's testimony, rig operator Charles Berry testified that when they started tripping the pipe the workers used three to four inches of positive lean.  He confirmed that pipe is always tied to the handrails.[14]  He also examined the same exhibit showing negative leaning pipe that Ray described as commonplace and testified that the pipe looked the same way on the day of the accident.[15]

---

[13] The majority claims that it is unreasonable to conclude from Ray's testimony that negative lean was common.  Obviously, the majority is unpersuaded and readily discounts Ray's testimony.  I quote from the testimony directly to support my view that a reasonable jury could conclude otherwise.

[14] On cross-examination, Berry was asked: "It's true, isn't it, Mr. Berry, that that handrail isn't meant to take the weight of all that pipe, is it; isn't that true?"  Berry replied: "I'm going to put it like this if I may, I have tied pipe to handrails every time I have ever worked derricks on a drilling rig or a workover whether it's from the side handrail or the back handrail."  In addition to Ray's testimony that pipe was always tied to the back handrail and Berry's testimony that he always tied to a handrail, derrickman
Kenneth Willoughby was asked, "How have you secured pipe in the racking board in your 18 years of experience when there wasn't a chain up there to secure it in the racking board?"  Willoughby responded: "Tie it off with sash cord or some kind of rope to your back handrail."  The majority likewise concedes that "[a]ccording to the testimony, however, pipes are often tied to the back handrail."  Maj. op. at 5 n.1.

[15] Berry was asked: "I will refer you to Plaintiff's Exhibit 29.16.  Mr. Berry, would you say that the pipe looked about as shown in this illustration that we have marked as Plaintiff's Exhibit 29.16?"  He answered: "From my point of angle, yes, sir, that would be just about it right there."  The majority erroneously claims that I characterize <u>Berry</u> as stating that negative lean was

Unquestionably, there is conflicting evidence. Hunter's own expert, Kenneth Kaigler, testified that while he had seen negative leaning pipe it was not common. Likewise there is ample testimony that negative lean could be corrected by "kicking out" the pipe at the bottom. Nonetheless, there remains the testimony of Ray and Berry that a jury could find credible and conclude that the racking board was being used in a manner that was common.[16]

Moreover, the majority's focus on the "tree" of negative lean obscures the "forest" of reasonably anticipated use. The evidence at trial reflects that the pipe was initially being racked with positive lean. It was secured to the back handrail as was common. As the pipe was being racked, it grew larger as expected. As a result, there was negative lean. At this point, the workers negligently failed to correct the lean. This failure, however, does not lead to the conclusion that the overall use of the board was not a reasonably anticipated one. Rather, the workers' failure to correct the lean speaks to their comparative fault. The jury clearly understood this and found both Hunter and his co-workers

_____

common. It was Ray who testified that the diagram showing negative lean was common. Berry merely confirms that the diagram reflected the lean of the pipe on the day of the accident.

[16] The majority claims that in determining whether the manufacturer should have reasonably expected negative lean, Kaigler's testimony "is of far greater importance than that of the rig workers." Maj. op. at 15 n.7. This is precisely the type of interference with the jury's province that we should eschew. Despite the majority's unwillingness to find the workers' testimony credible, the jury could. This is especially true given the fact that the founder of KREMCO testified that they did not make any assumptions as to how the customer would use the racking board. Maj. op. at 13 n.5.

- 21 -

partially at fault.[17]  The workers' negligence should not, however, insulate KREMCO from its own fault.  Viewing the entire context of the use of the racking board prior to the accident, a reasonable jury could conclude that it was being used in a manner that was reasonably anticipated by the manufacturer.

Consequently, I am unpersuaded by the analogy the majority draws with other examples where a manufacturer would not be liable under Louisiana law.  At issue here is not a foreseeable, yet bizarre, use of a product such as using a soda bottle as a hammer or driving a car across water.  Maj. op. at 9-10.  Rather, the evidence reflects that the racking board was being used for its intended purpose (to rack pipe) and in a manner that a jury could conclude was common.

The majority's reliance on <u>Lockart v. Kobe Steel Ltd. Constr. Mach. Div.</u>, 989 F.2d 864 (5th Cir. 1993), is also unpersuasive because of its procedural posture.  In <u>Lockart</u>, two workers lifted a steel pontoon by chaining it to the teeth of the bucket scoop of an excavator.  The workers then worked underneath the suspended pontoon.  The chain slipped from the teeth dropping the pontoon on the workers.  While we found that using an excavator to suspend a pontoon was not a reasonably anticipated use, we did so after conducting our own independent review of the evidence as is our standard for summary judgment review.  We held that "in this

_____

[17]     The jury found that Hunter's death was caused by his own negligence and assessed 5% fault to him.  It found that his death was also caused by the negligence of employees of Mosley Well Service and apportioned their fault, 35%, against Mosley Well Service.

instance in which the manufacturer provided a clear warning, the product was handled by experienced users, and no hard evidence was offered to rebut these facts, we must affirm the judgment of the district court."  Lockart, 989 F.2d at 869.  Unlike Lockart, in this controversy we review a jury's verdict and must give deference to that verdict if there is support in the record.  This is true even if there is substantial contradictory evidence that could support the opposite.  We are not free to review the evidence de novo and draw our own conclusion on reasonably anticipated use.

Viewing the record in the light most favorable to the verdict, I would conclude that there is some evidence that the jury could credit that negative lean itself is common.  Moreover, properly viewed in context, the overall use of the racking board was also routine.  The jury found that Hunter's death occurred during this reasonably anticipated use of the racking board.  I would stay out of the jury box and affirm.[18]

---

[18]    Because of the majority's resolution of the anticipated use issue, it did not reach whether the racking board was unreasonably dangerous.  Having reviewed the record, I would conclude that there is ample evidence to support the jury's verdict on this issue as well.  In an effort not to unnecessarily lengthen this dissent, I would note that there was expert testimony of alternative designs and safety mechanisms, existing at the time of manufacture of the racking board at issue, which would have prevented Hunter's death.  This evidence not only supports the jury's conclusion on an unreasonably dangerous product, but provides additional evidence from which a reasonable jury could conclude that the manufacturer should have anticipated negative lean; it appears that other manufacturers did.