701 So.2d 1360 (1997)
James Patrick JOHNSON, et al., Plaintiffs-Appellants,
v.
BLACK & DECKER U.S., INC., Defendant-Appellee.
No. 29996-CA.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1997.
*1361 Michael Sidney Hubley, Shreveport, for Plaintiffs-Appellants.
Frank Meredith Walker, Jr., for Defendant-Appellee.
Before NORRIS, WILLIAMS and STEWART, JJ.
NORRIS, Judge.
The plaintiff, James Patrick Johnson ("Johnson"), suffered an amputation of his right index finger and near amputation of his right middle finger when they came into contact with the circular blade of the Black & Decker U.S., Inc. ("Black & Decker") Model 1703 power miter saw he was using. Johnson and his wife sought damages for his personal injury and for her loss of consortium. Johnson's insurer, Commercial Union Insurance Company, sought reimbursement of compensation benefits and medical expenses paid to Johnson. The matter proceeded to trial, after which the jury returned a verdict in favor of the defendant, Black & Decker, finding that the saw was not unreasonably dangerous in design.
The plaintiffs have appealed, urging the jury committed manifest error in (1) failing to determine that the incident saw that injured Johnson was unreasonably dangerous in design and (2) failing to award special and general damages to Johnson and his wife. For the following reasons, we affirm the judgment of the trial court.

FACTS
During the early morning of November 18, 1988, at approximately 6:45 A.M., Johnson arrived at a residential home in Shreveport, Louisiana that was under construction. Johnson was lead carpenter on site for his employer Jack Poche Homes, Inc., a company *1362 that builds residential homes. Johnson has been employed by Jack Poche Homes, Inc., since 1978. One of his tasks that morning was to construct "picture frame molding" in the interior of the house. To fabricate the molding, Johnson made a repetitive angled cut on each of several wood strips with the saw.
Johnson used a power miter saw. A power miter saw has a rotating circular blade requiring an operator to pull the trigger to spin the blade, and push the handle of the saw in a fixed straight downward motion to allow contact between the blade and the wood material.
The saw was placed on the counter top of a U-shaped bar in the kitchen. Johnson would cut several strips of wood, stack those strips on the other side of the U-shaped bar, and return to cut more wood. After a sufficient amount of strips were cut, Johnson would leave the kitchen and assemble the molding upon the wall in the den of the house.
Johnson, who is right handed, would use his right hand to control the trigger and handle of the saw, and his left hand to hold the material against the base of the saw while making the cut. On one of the last pieces of wood trim in the stack to be cut, Johnson, using his right hand, lowered the handle and rotating blade of the incident saw into the wood, made the cut, raised the handle along with the blade, and released the trigger. Immediately thereafter, his right hand somehow made contact with the rotating blade. (Johnson cannot recall how this occurred, but he speculates that he made contact with the lower front portion of the blade after he released the trigger while the arm of the saw was in the upright position.) Johnson's index finger was completely cut off and his middle finger was hanging onto the rest of his hand by a shred of skin. No one was in the kitchen when the accident occurred, and Johnson himself had no idea how his hand came into contact with the blade. A coworker, Greg King, rushed Johnson to the emergency room.
That same day, Dr. Cunningham, a plastic and reconstructive surgeon specializing in the hands, operated on Johnson to replant his fingers. During the next several months, Johnson would eventually undergo two additional surgeries in the attempt to restore the use of his fingers. He would also participate in therapy at the Shreveport Hand Rehabilitation Center for nearly ten months following the accident under the direction of occupational therapist Ann Harris.
In 1992, Johnson returned to full time work with Jack Poche Homes, Inc. as a supervisor and a part time carpenter.
The saw was manufactured by Black & Decker in May 1986. Johnson was present with his employer and uncle, Jack Poche, when the saw was purchased from McLamroch Sales Inc., in August 1986. After the purchase but before Johnson suffered his injury, the lower plastic blade guard was removed from the saw. Johnson admitted that because of his position at Jack Poche Homes, Inc., he had either removed the guard himself or permitted someone else to do so.
The saw was also equipped with a manual brake button affixed to the left side of the handle. By applying pressure to the button, an operator could utilize frictional forces to bring the blade to a stop in less than five seconds after release of the trigger.

APPLICABLE LAW
The Louisiana Products Liability Act ("LPLA") establishes that the manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant. La. R.S. 9:2800.54 A. The claimant must prove, initially, that his damages arose from a reasonably anticipated use of the product; the manufacturer is not liable for damages arising from an unreasonably anticipated use. "Reasonably anticipated use" means a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances. La. R.S. 9:2800.53(7). If the claimant is urging a defect by design, he must also prove that the characteristic of the product that renders it unreasonably dangerous *1363 must exist at the time the product left the control of its manufacturer, or result from a reasonably anticipated alteration or modification of the product. La. R.S. 9:2800.54 C. "Reasonably anticipated alteration or modification" means a change in a product that the product's manufacturer should reasonably expect to be made by an ordinary person in the same or similar circumstances, and also means a change arising from ordinary wear and tear. La. R.S. 9:2800.53(8). However, reasonably anticipated alteration or modification does not mean: Changes to or in a product or its operation because the product does not receive reasonable care and maintenance. Id.
In the instant case the plaintiffs have alleged that Black & Decker is liable under the LPLA because the saw is unreasonably dangerous in design. Design defects are regulated by La. R.S. 9:2800.56, which provides:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
See also, Ashley v. General Motors Corp., 27,851 (La.App.2d Cir. 1/24/96), 666 So.2d 1320.
Thus, after establishing that his damage arose from a reasonably anticipated use of the product, a claimant who alleges defect by design under La. R.S. 9:2800.56 must prove three elements. First, he must prove that another way to design the product existed at the time the manufacturer placed the chosen design on the market. See Kennedy, A Primer on the Louisiana Products Liability Act, 49 La. L.Rev. 565 (1989). Next he must prove that the alternative design was capable or would have been "significantly less likely" than the chosen design to cause the claimant's complained of damages, or that the alternative design would have significantly reduced such damage. Id., at 597. Finally, the claimant must prove that, at the time the product left the manufacturer's control, the likelihood that the product as designed would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design identified by claimant, and the adverse effect, if any, this different mode of design would have on the products utility. Id. This is the "risk-utility balancing test." Cf. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986).
In a products liability action, the determination of whether a defect is unreasonably dangerous is a question of fact. Hines v. Remington Arms Co., 94-0455 (La.12/8/94), 648 So.2d 331; Taylor v. American Laundry Mach., Inc., 27,121 (La.App.2d Cir. 6/23/95), 658 So.2d 288, writ denied 95-1877 (La.11/3/95), 661 So.2d 1385. Each case is resolved primarily on its own particular facts. Sawyer v. Niagara Mach. & Tool Works Inc., 535 So.2d 1057 (La.App. 2d Cir. 1988), writ denied 536 So.2d 1222 (1989). The factual findings of a District Court will not be disturbed absent manifest error. Powell v. Regional Transit Authority, 96-0715 (La.6/18/97), 695 So.2d 1326; Rosell v. ESCO, 549 So.2d 840 (La.1989). When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court on review should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact. Powell, supra, citing Canter v. Koehring Co., 283 So.2d 716 (La.1973). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra.

*1364 ANALYSIS
We must review whether the jury committed manifest error in finding that the product was not unreasonably dangerous in design.[1] Although the major thrust of the plaintiffs' case has been proof of alternative designs which allegedly were capable of preventing Johnson's injury, we first consider the threshold issue of reasonably anticipated use: could the jury have found that removal of the lower gravity guard was not a reasonably anticipated alteration of the saw, and that subsequent use of the altered saw was not reasonably anticipated use?
The saw had been designed and sold with a lower gravity guard, consisting of plastic side panels covering each side of the circular saw blade. When the arm of the saw is lowered to allow contact between the work piece and the blade, the guard first makes contact with the workpiece, and become displaced. As the arm of the saw is raised back into its original position, retracting from the workpiece, the guard slides back down into place. However, the guard had been removed, either by Johnson himself or with his consent.
Plaintiffs contend that the removal of the lower gravity guard was a reasonably anticipated alteration and therefore operation of the unguarded or altered saw was a reasonably anticipated use. Johnson stated the following as justification for removal of the guard:
What happens is the type [that] when you make a lot of cuts resin and stuff gets on them [blade guards]. You might can see it on that older saw. You get a buildup on there and even if you take it off the plastic kind of scratches and its gets real hazylooking. You got to turn your head, and you get to where you lose confidence in the guards and you take them off. (Typos in original have been corrected.)
Nevertheless, Johnson assumed that the guard's purpose was to prevent inadvertent hand contact with the blade. In other words, he assumed the guard was a safety device. Furthermore, the instruction manual to the saw contained numerous warnings indicating that the saw must not be operated without the guard. Johnson stated that he had only vague, if any, recollections about the safety instructions contained in the manual. The manual also directed that the saw should be inspected for broken or damaged parts, including the guards, so that they may be serviced or replaced. Johnson's testimony indicated that he checked the saw only when it would not operate, not when safety devices failed to function.[2] He felt, nevertheless, that the saw was safe enough.
Plaintiff's expert engineer, Bill Stanfield, additionally testified that the guard was probably removed because of poor angle view for the operator. Other testimony, however, showed that Black & Decker sold replacement for lower gravity guard which have become scratched or damaged. Stanfield even admitted that he bought a replacement guard for the saw at a Black & Decker store for litigation and testing purposes.
In Hoyt v. Wood/Chuck Chipper Corp., 92,1498 (La.App. 1st Cir. 1/6/95), 651 So.2d 1344, writ denied 95-0753 (La.5/19/95), 654 So.2d 695, the plaintiff was injured when he accidentally activated a woodchipper while changing the blades. The chipper, as designed, *1365 required an operator to insert a key to activate the chipper. Three weeks before the accident, plaintiff's employer had the chipper serviced for repairs to its ignition system. While it was being serviced, the employer requested that a the key ignition system be replaced in favor of a toggle switch. The evidence showed that the key ignition system served as a safety feature, while the toggle switch allowed for easier activation of the chipper. The plaintiff was not aware of the modification and accidentally activated the machine, resulting in his injury. He sued various manufacturers under the LPLA. The court of appeal stated that the plaintiff's contention that the chipper was unreasonably dangerous because it did not contain an alternative design ignored the fact that they keyed ignition switch served as a safety feature to prevent inadvertent activation of the chipper. The court additionally held that had the key ignition switch not been removed, the injury more probably than not would not have occurred.
Likewise, in Berry v. Commercial Union, 565 So.2d 487 (La.App. 2d Cir.), writ denied, 569 So.2d 959 (La. 1990), the plaintiff was injured when he slipped and fell from a ladder while holding onto a power saw from which the lower blade guard had been removed. During the fall, he inadvertently activated the saw; three of his right fingers made contact with the blade and were severed. He sued, arguing that the manufacturer should have equipped the saw with a trigger lock switch that prevents inadvertent activation of the power saw. Utilizing pre-LPLA law, this court held that the owner's removal of the guard and the act of bringing it to the workplace violated the warnings and instructions stated in the owner's manual, and thus was an abnormal use.[3] The damages sustained arose from the abnormal use, not the manufacturer's failure to provide an alternative device. Moreover, had the guard been on the saw, more probably than not the injury would not have occurred.
In the instant case, the evidence showed that while replacement of the guard was foreseeable, and even anticipated, outright removal of the guard, without even a substandard replacement, was not a reasonably anticipated alteration. In Berry, supra, the use of a circular saw without a guard was found to be not normal use of the product; a fortiori, the use of the miter saw without a guard in this case has not been shown to be a reasonably anticipated use. On the record presented, the jury was entitled to find no reasonably anticipated use. This is a prerequisite to the plaintiff's right to recover under La. R.S. 9:2800.54 A. A manufacturer can be liable only if the damage arose from a reasonably anticipated use of the product, and if not, then a court need not reach the issue of whether the product is unreasonably dangerous. Hunter v. Knoll Rig & Equip. Mfg. Co., Ltd., 70 F.3d 803 (5th Cir.1995), cert. denied, ___ U.S. ___, 117 S.Ct. 166, 136 L.Ed.2d 108 (1996).
Admittedly the Hoyt and Berry situations involve the removal of safety devices under circumstances in which it was a foregone conclusion that the devices, had they been left in place, would have more likely than not prevented the injury. Here, the plaintiffs contend that the injury would have occurred even had the guard been on the saw. That being the case, then the issue as to whether the removal of the guard was reasonably anticipated or not becomes moot, i.e., the guard's presence or absence becomes irrelevant.
Before discussing whether the guard was more likely than not to have prevented this injury, a brief note concerning the guard's limitations should be made. From the evidence[4] it is apparent that with the presence *1366 of the gravity guard, a person's hand would be injured only if it approached the blade from the lower front portion or leading edge of the blade. A right-handed person would have to release the trigger while the saw was in the upright position, somehow get his hand under and in front of the blade, and not react to the pressure of the gravity guard, in order to cut his hand. If the hand approached from a sideward or downward angle, the injury would be extremely unlikely. Therefore, determining exactly how Johnson's hand approached the blade is critical to the argument that the lower front guard would not have been capable of preventing the injury.
Johnson was unable to testify as to the exact events that led up to the injury. Although he a able to state that the injury occurred sometime after he released the trigger while the arm of the saw was in the upright position, he could not recount his exact hand motions.
The circumstantial evidence on this issue also shows little. Dr. Cunningham's testimony principally described the development of scar tissue, and is not especially probative as to how the cut occurred.
Black & Decker's wood-working equipment and accident reconstruction expert, Walter Painter, did illuminate the fact that a human hand must be supported on a surface in order to sustain a straight cut. Johnson's contention is that he received a straight cut. While it is difficult to glean insight into dimensional facts from a written record, it appears that if Painter's and Johnson's assumptions are correct, then the arm of the saw had to be lowered to make contact with Johnson's supported hand.
Plaintiff's exhibit # 7 shows a diagram of Johnson's hand and the cuts on his fingers. They are parallel angle cuts to his right index and middle finger. At trial, Johnson stated that he was using the incident saw in the right 45 degree angle miter position. The angles of the hand cuts and that of the blade are diametrically opposed. Based on that information, a jury could easily infer that Johnson did not prove, more probably than not, that his hand was cut when approaching the blade from the lower front portion.[5]
In sum, the jury received evidence that a saw properly equipped with the gravity guard would cut a hand only if the hand were positioned firmly, in front of and below the cutting edge of the blade; that the appearance of the injury suggested a lateral or angled contact between hand and blade; and that Johnson could not describe precisely how the accident occurred. From this evidence, the jury could easily infer that Johnson failed to prove that a saw properly equipped with a gravity guard would, more probably than not, have caused his injuries. We perceive no manifest error in the jury's conclusion that Johnson's use of the unguarded saw was not reasonably anticipated, and that it caused his injuries.
However, even if the jury did not consider whether the damages arose from a reasonably anticipated use, out of an abundance of caution, we have reviewed the evidence and find that the risk created by the incident saw does not outweigh the burden and utility in incorporating the alternative designs.
Under La. R.S. 9:2800.56(1), the plaintiffs have the burden to establish that there was an alternative design capable of preventing the injury. Johnson argues that there were two alternative designs for the saw that were capable of preventing the injury, i.e., a saw *1367 equipped with an automatic brake and a saw equipped with a link actuated guard.
The first alternative design is an automatic brake, which Black & Decker had manufactured for its power miter saws for over 10 years prior to this accident. Automatic brakes are designed to stop a blade from rotating 1-3 seconds after the trigger is released. Johnson contends that an automatic brake would have stopped the blade before his hand made contact, and thus averted his injuries. Tom Owen, one of plaintiff's expert engineers, recorded the "coast down time"[6] of the incident saw at 11.26 and 11.72 seconds.
To bolster their case, plaintiffs introduced a power miter saw equipped with an automatic brake that was manufactured by Black & Decker in 1977 ("exemplar saw") to demonstrate that the automatic brake was an alternative design capable of preventing the injury.[7] Owens recorded the coast time down time of the exemplar saw as well: 1.74 to approximately 1.8 seconds. Owens opined that "an automatic brake in the circumstances surrounding Mr. Johnson's accident would have prevented, or substantially reduced," his injuries.
Walter Painter, a defense expert who was the lead co-inventor of the automatic brake, agreed that Johnson's injuries would have been prevented or at least lessened if Johnson has been using the exemplar saw.
The other alternative design is a link actuated guard, which had been incorporated into Black & Decker's beveling saws since prior to the manufacture of the incident saw. A link actuated guard wraps around the blade when the arm of the saw is in the upright position; it moves out of the way when the arm is lowered. This type of guard offers no protection from sidewards contact while the operator is cutting the workpiece, but does offer frontal protection when the arm of the saw is fully raised. Walter Painter admitted that if the incident saw had been equipped with a link actuated guard and the arm of the saw was in the upright position prior to hand contact, then Johnson could not have made contact with the blade. Daniel Montigue, Black & Decker's safety assurance manager, stated that if the operator moved his hand in the downwards motion after release of the trigger towards the front of the blade, the link actuated guard would have prevented contact. Further, he explained that one would have to extend one's hand very far under the blade to make contact.
Even though plaintiffs may have demonstrated that the automatic brake and the link actuated guard were designs that were capable of preventing certain types of injuries, the plaintiffs still had the burden to prove that the proposed alternative designs would have been significantly less likely than the chosen design, "used correctly," to cause the damages. As noted before, the incident saw equipped with the gravity guard was capable of preventing certain types of injuries as well. Therefore, a jury could find that the plaintiffs did not meet their burden.[8]
However, assuming without deciding that the automatic brake and the link actuated guard are alternative designs capable of preventing Johnson's injuries, plaintiffs still have the additional burden to prove that the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design on the utility of the product. La. R.S. 9:2800.56(2). The probability that the chosen design would cause the complained of harm has already been addressed.
However, the plaintiffs must show that the risk of the chosen design was greater *1368 than both the burden on the manufacturer in incorporating the alternative design and the adverse effect, if any, that the alternative design would have on the product's utility. See Kennedy, supra at 598. As has been noted above, the burden on Black & Decker to incorporate the automatic brake or the link actuated guard onto the power miter saw is not demanding. While the automatic brake may not have been able to interact with the motor on the incident saw, Black & Decker nevertheless could have and has designed miter saws equipped with automatic brakes. Testimony indicated that merely an additional sixteen dollars (in 1980 dollars) would be added to the actual cost of the saw by the addition of an automatic brake. However, a jury could find that the utility of the alternative design pales by comparison to the design of the incident saw.
Walter Painter testified about the mechanics of the brake. He stated that the brake operates by changing the polarity in the motor. This polarity change creates arcing, increases mechanical loads, and accelerates the wear and tear on the saw. Eventually, the brake's operation will become erratic and unpredictable. Daniel Montigue testified that the automatic brakes were first incorporated onto the power miter saws in the 1970s so as to compete with its rivals. He further stated that the automatic brake is not designed to be a safety device despite some initial advertisements by Black & Decker proclaiming otherwise. Instead, the brake's purpose is to increase operator efficiency by reducing the time an operator must stand by while the blade proceeds to a stop before placing hands near or around the blade. He further testified that the automatic brake becomes inconsistent and its incorporation onto power saws unexpectedly and abnormally decreased the life span of the saw. Due to the complaints about the long term usefulness of the automatic brake, increased service time for the saws, and decreased sales, Black & Decker discontinued their production during the 1980s.
Plaintiffs, on the other hand, argue that the automatic brake is in fact a safety device, as evidenced by Black & Decker's advertisements and by the fact that Johnson's injury would have been prevented if the rotating blade had stopped within a few seconds after release of the trigger. Plaintiffs additionally argue that contentions that the automatic brake becomes erratic or inconsistent over time is unjustified by the fact that plaintiff's exemplar saw manufactured in 1977 has an automatic brake that stopped the blade in less than two seconds. Black & Decker counters by noting that the operation of the saw, and not the passage of years, causes the deteriorated effectiveness of the automatic brake.[9]
Whether the automatic brake is characterized as a safety device or not is not the issue. Instead, a jury needs to weigh the utility of a saw with an automatic brake (along with the burden of adoption) against the risk posed by the chosen design. After due consideration of the evidence presented, we find that a jury would not be manifestly erroneous in finding that the risk did not outweigh the burden and the utility. Thus, a jury could find that the absence of an automatic brake on the power miter saw injuring Johnson was not unreasonably dangerous.
Plaintiffs also propose that the lack of a link actuated guard also posed a risk upon an operator of the incident saw. As noted above, the link actuated guard fully protects a hand from making contact with the blade while the arm of the saw is in the upright position. The incident saw offers little protection from the front or leading edge of the blade while the arm is in the upright position.
Similar to the automatic brake, the burden in adopting the link actuated guard onto the miter saw was slight. Black & Decker started manufacturing the guard to accompany a beveling saw beginning in December of 1985. The utility of equipping the incident saw with the link actuated guard appears low. As noted more fully above, the link guard exposed the blade fully when the arm of the *1369 saw was lowered; the gravity guard still covered the blade on the sides. Furthermore, the incident saw was designed to have an operator activate the saw with his or her right hand and hold the workpiece firmly in place on the platform of the saw with the left hand. Thus, during a cut, a left hand is expected to be very close and would be very close to a fully activated blade. Both Montigue and Painter testified that the link actuated guard was not any more safe than the gravity guard. Instead, the link guard exposed the blade during the cut while the gravity guard left the lower portion of the blade exposed immediately after the cut. It was contended at trial that a fully exposed blade during the cutting process posed a greater danger to an operator who is supposed to have his left hand near the blade supporting the work piece against the saw's platform, than a partially exposed blade after the cut has been made and the trigger is released. Plaintiffs argued that an exposed blade after the cutting process posed an equal danger to an operator. However, the evidence does show that neither guard can protect against both dangers, and scant evidence was presented as to which danger was actually greater. Stated another way, the link actuated guard would protect against one type of danger, but expose an operator to another and more dangerous hazard during the cutting process. A jury could find that each guard serves the same needs and the risk is not lessened by the link actuated guard over the gravity guard but rather the risk is transferred. From this record a jury could also find that the risk posed by the chosen design did not outweigh the burden and utility of adoption. Therefore, a jury would not be manifestly erroneous in failing to find that the power miter saw, as designed, was not unreasonably dangerous.

CONCLUSION
For the reasons expressed, the jury was not plainly wrong to find that Johnson's injuries did not arise from a reasonably anticipated use of the power miter saw, or in its finding that had the saw been subjected to reasonably anticipated use, the injury would likely not have occurred. The jury was not plainly wrong in its implicit finding that the plaintiffs failed to prove that the risk encountered by the saw outweighed the burden and utility in adopting the alternative designs. In light of these conclusions, we need not address the plaintiffs' second assignment of error, regarding damages. The judgment is affirmed at plaintiffs' costs.
AFFIRMED.
NOTES
[1] The jury verdict form used in this case first asked:

1. Do you find that the saw in question, Model Number 1703, was unreasonably dangerous in design which caused the injury to James Patrick Johnson?
Yes______ No______
The jury marked the above jury interrogatory "No" and answered no further interrogatories as instructed. Although not noted by counsel, the above interrogatory is a compound question which makes the above jury finding initially vague as to whether the jury found the saw unreasonably dangerous in design or whether the jury found the saw unreasonably dangerous in design, but that the defect making the saw unreasonably dangerous in design was not the proximate cause of Johnson's injuries.
[2] Evidence that the guard had been recalled by Black & Decker a few months before the accident, while noteworthy, only served to prove was that the recall had nothing to do with plaintiff's allegation that the guard was incapable of preventing his injury. Daniel Montigue, a Black & Decker representative, testified that the lower guard had the tendency to get locked up with the upper guard when the arm of the saw was fully lowered. This apparently happened when the lower guard would make contact with the upper guard's housing mechanism.
[3] Furthermore, plaintiff subjected the saw to abnormal use by either ignoring instructions that the guard was missing or failing to notice such an obvious danger and carrying the saw in his subordinate hand while climbing an unsecured ladder.
[4] Defense experts testified that the prime protection offered by the gravity guard is sideward protection. In a hypothetical situation it was admitted that the guard would not protect a hand that approached the guard from the front or leading edge of the saw. However, if the hand approaches the blade from a 25 degree off the parallel angle to the blade, the guard may bind and dig into the saw. Another defense expert corroborated the testimony that the gravity guard provides a protection barrier from the side of the blade. Further testimony established that the guard is not as generous in frontal protection as in sidewards protection, but it does offer a tactile awareness barrier if one hits the guard from the lower front area of the blade.

Plaintiffs' experts concluded that the gravity guard would not have prevented an injury resulting from a frontal impact with the blade; it would, however, have protected from a lateral contact.
[5] As a side note, testimony was adduced that the incident saw may not have been maintained in proper condition. The upper guard was rendered difficult to difficult to tighten and the positive stops, designed to prevent the blade from switching miter positions, were non-functional at the time of trial, although their status at the time of the accident remains uncertain. A jury could infer that the blade may have unexpectedly swung from the right to the left degree miter position which would be consistent with Johnson's cuts.
[6] Coast down time refers to the period of time between the moment the trigger supplying power to the motor is released to the moment the blade stops spinning without any intervening circumstances present. Underwriter's Laboratories (UL) had set a 15 second coast down time standard.
[7] Because Black & Decker actually manufactured the "alternative design" plaintiffs claim would have prevented the injury and it was manufactured prior to the manufacture date of the incident saw, the applicable defenses under La. R.S. 9:2800.59 were not addressed by the parties.
[8] It makes little sense to argue that alternative designs were capable of preventing claimant's damages when the chosen design was capable of preventing the damage also.
[9] The exemplar saw was purchased by plaintiff's attorney at a pawn shop in Shreveport. Defense notes that there is no evidence concerning whether the saw had been serviced before or whether it had been subject to extensive operation in the past 17 years.