RHESA H. BARKSDALE, Circuit Judge:
Following a bench trial, judgment was rendered against Jerry Matthews’ claim under the Louisiana Products Liability Act (LPLA), La.Rev.Stat. Ann. §§ 9:2800.51-.59' (1988), for his injuries that resulted from his firing a Remington Model 710 rifle. When Matthews fired it, the bolt head, which was designed to be connected to the bolt body by a bolt-assembly pin, did not lock with the barrel, allowing an uncontained explosion.
At issue are the district court’s findings that: the bolt-assembly pin was missing, rather than out-of-specification, when Matthews fired the rifle; and, pursuant to LPLA, manufacturer Remington Arms Company, Inc., did not “reasonably anticipate” a user would fire its rifle after someone had removed, but failed to reinstall, that pin. Concerning that reasonably-anticipated-use finding, primarily at issue is whether the district court erred by con- *638 eluding that, for purposes of LPLA, the scope of Matthews’ “use” of the rifle included such removal and failure to reinstall; that is, whether his “use” was firing the rifle with the bolt-assembly pin missing, as opposed to only firing it. AFFIRMED.
I.
Following the bench trial in June 2009, the district court rendered findings of fact and conclusions of law. See Matthews v. Remington Arms Co., No. 07-1392, 2009 WL 2970441, at *1 (W.D.La. 16 Sept. 2009). The only contested finding is that, prior to Matthews’ firing the rifle, the bolt-assembly pin had been removed but not reinstalled, as opposed to its’ being in the rifle but out-of-specification or not functioning.
In 2000, Remington introduced its Model 710 bolt-action rifle. Instead of using a solid bolt, that model was manufactured with a two-piece bolt assembly: the bolt head is attached to the bolt body with a bolt-assembly pin. The bolt handle is attached to the bolt body. When the bolt handle and, therefore, the bolt body, is rotated downward, the bolt head (if the bolt-assembly pin is installed) simultaneously rotates downward and locks the “lugs” on the bolt head into the mating locking recesses in the receiving barrel interface (rifle receiver): the firing position. In such an instance, the rifle is “in battery”. Only when the rifle is in battery will it fire properly.
The bolt-assembly pin, a cylinder, is not of insignificant size; it is .685" long and .247" in diameter. It is made from low-strength, unhardened steel. The pin is essential to the simultaneous downward rotation of the bolt head and body. If the bolt-assembly pin is missing or malfunctioning, it is possible for the bolt handle and body to be rotated into locked position without the bolt head also rotating into locked position. In that situation, the lugs on the bolt head will not lock into the mating locking recesses in the rifle receiver, resulting in inadequate engagement between the bolt-head lugs and their locking recesses. In this situation, the rifle is “out of battery”. If the trigger is pulled while a round is chambered and the rifle is out of battery, the rifle will either misfire or, as happened to Matthews, have an uncontained explosion.
Under normal conditions (in battery), the bolt-assembly pin does not contain the pressure from the cartridge’s being fired; the bolt head contains the pressure with the seal that is created when the locking lugs are engaged with their mating recesses in the rifle receiver — that engagement is critical to pressure containment. Accordingly, the rifle can be fired without the pin in place if the bolt head is locked in place — the pin is not the critical pressure containment device.
The Model 710’s owner’s manual instructs users to disassemble the bolt assembly, including removing the bolt-assembly pin, for cleaning; and to reassemble the bolt assembly, by reinserting the bolt-assembly pin. Remington also instructs its factory assembly workers to keep a finger beneath the bolt-assembly-pin hole on the bolt body to prevent the bolt-assembly pin from falling out during assembly; however, this instruction is not included in the owner’s manual. The owner’s manual does not include any warnings of potential hazards if the bolt-assembly pin is not properly installed. Matthews, who borrowed, insteád of owned, the rifle, testified he neither received, nor read, the owner’s manual prior to the accident.
As of this action’s being filed in August 2007, Remington had sold nearly 500,000 *639 Model 710 rifles; but, it had not received a report of a user firing a Model 710 rifle without an installed bolt-assembly pin. Following the district court’s ruling in favor of Remington in September 2009, however, Matthews moved unsuccessfully, pursuant to Federal Rule of Civil Procedure 60, for a new trial or to have the judgment altered or amended, based on newly discovered evidence of an October 2008 incident for which a Remington customer reported to Remington that his Model 770 rifle (part of the Model 710 series and also employing a two-piece bolt assembly) came apart when he tried to open the bolt to eject a cartridge. The district court ruled that this newly discovered evidence did not change the trial result and would not have provided Remington with notice of any problem when the rifle fired by Matthews was manufactured in September 2001. Matthews v. Remington Arms Co., No. 07-1392, 2009 WL 4456318, at *3 (W.D.La. 23 Nov. 2009).
When the rifle fired by Matthews left Remington’s control in 2001, it contained a bolt-assembly pin manufactured to specifications. Matthews’ mother-in-law, Margaret Minchew, purchased the rifle from her nephew in 2006. It had been owned by several persons before she purchased it; but, when she acquired it, she did not receive the owner’s manual.
Before the date of the accident, Matthews and others fired the rifle without incident; but, prior to Matthews’ accident, someone disassembled the rifle and the bolt assembly and failed to reinstall the bolt-assembly pin. (As noted supra, this critical finding of fact by the district court is contested by Matthews; he maintains that, when he fired the rifle, the bolt-assembly pin was either defective or malfunctioning, rather than missing.)
Approximately two to four weeks before the accident, Margaret Minchew loaned the rifle to her daughter, Amanda Min-chew. She and the man with whom she was living, Nicholas Glass, lived next door to Matthews and his wife, another of Margaret Minchew’s daughters.
Matthews borrowed the rifle from Amanda Minchew on the morning of the accident in October 2006; the bolt handle appeared to be closed. Matthews took the rifle to his house to obtain ammunition, and then proceeded to another’s to “sight” the scope that had been installed recently on the rifle by Nicholas Glass.
In preparing to fire the rifle, Matthews rotated the bolt handle upward; pulled it back in order to load a shell; loaded it; pushed the bolt handle forward; and rotated it downward into what appeared to be the closed position. When he pulled the trigger, the shell did not fire (misfired). He again rotated the bolt handle; pulled it back slowly (because he knew there could be compression); and removed the shell. Observing nothing wrong with the shell, Matthews reloaded a shell; pushed the bolt handle forward; rotated it downward into what appeared to be the closed position; and pulled the trigger. The rifle fired. Upon its doing so, an uncontained explosion occurred, sending portions of the bolt assembly into Matthews’ head, causing serious injuries, including the loss of an eye.
The accident resulted from the absence of the bolt-assembly pin: the bolt handle and body had rotated downward, but the bolt head had not. Therefore, the locking lugs on the bolt head failed to engage the locking mating recesses in the rifle receiver, and the rifle was out of battery. Matthews knew it would be dangerous to fire the rifle if either the bolt-assembly pin was missing or the bolt handle was not closing properly.
*640 In district court, Matthews contended, inter alia: firing the rifle out of battery (due to the absence of the bolt-assembly pin) was a “reasonably anticipated use” under LPLA because the rifle appeared to operate normally and a failure to reinstall the bolt-assembly pin was foreseeable to Remington; and the rifle was “unreasonably dangerous” in construction and design and lacked an adequate warning. Remington disputed this and also contended, inter alia, that Matthews’ use of the rifle was “obviously dangerous”, claiming he knew the bolt would not close properly prior to firing the rifle.
The district court’s findings of fact were, inter alia: Matthews’ use of the rifle was not “obviously dangerous”; “[a]t some point prior to the accident, however, someone disassembled the bolt assembly and failed to reinstall the bolt assembly pin”; and his using it in an “out of battery” condition — the bolt-assembly pin missing — was not “reasonably anticipated” by Remington. Matthews, 2009 WL 2970441, at *2^4 (emphasis added). Concerning the latter finding, the court concluded that, absent special circumstances not present in this action, Remington was entitled to expect an ordinary user to reassemble the rifle with all its parts, including the bolt-assembly pin. Id. at *4. Having found no “reasonably anticipated use”, which, as discussed infra, is the threshold LPLA element, the district court ruled in favor of Remington and declined to address the remaining LPLA elements at issue. Id.
In denying Matthews’ motion for a new trial, and in regard to the bolt-assembly pin, the district court found: trial evidence established that the pin was not defective, but was removed prior to the accident; and “Remington’s expert testified that the bolt assembly pin was manufactured to specifications and that the accident was caused by a missing, not broken, bolt assembly pin”. Matthews, 2009 WL 4456318, at *2.
II.
Louisiana law controls for this diversity action. See generally Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). LPLA “establishes the exclusive theories of liability for manufacturers for damage caused by their products”. La.Rev.Stat. Ann. § 9:2800.52. A claimant under LPLA must prove: (1) “damage proximately caused by a characteristic of the product that renders [it] unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity”; (2) the product was “unreasonably dangerous” either in construction, design, or warning; and (3) the characteristic rendering the product unreasonably dangerous either “existfed] at the time the product left the control of its manufacturer or resulted] from a reasonably anticipated alteration or modification of the product” (depending on the type of defect claimed). Id. at § 9:2800.54 (emphasis added).[1]
*641 Because “reasonably anticipated use” is the threshold LPLA element, and the district court limited its analysis to that element, our review does not reach whether the rifle is “unreasonably dangerous” because, inter alia, its design permitted it to be fired with the bolt-assembly pin missing — out of battery. The LPLA section at issue provides: “The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity”. La.Rev.Stat. Ann. § 9:2800.54(A) (emphasis added). “The availability of an alternative design is relevant only if the user was engaged in a ‘reasonably anticipated use’ of the product, for unless that threshold element is satisfied, a manufacturer does not have a legal duty to design its product to prevent such use.” Butz v. Lynch, 762 So.2d 1214, 1217-18 (La.App. 1st Cir.2000); see also Kampen v. Am. Isuzu Motors, 157 F.3d 306, 309 (5th Cir.1998) (en banc) (“If a plaintiffs damages did not arise from a reasonably anticipated use of the product, then the ‘unreasonably dangerous’ question need not be reached.”) (citing Johnson v. Black & Decker U.S., Inc., 701 So.2d 1360, 1366 (La.App. 2d Cir.1997)). Accordingly, our analysis is limited to the question of reasonably anticipated use.
As noted, Remington maintained in district court that Matthews’ use of the rifle was obviously dangerous, asserting he knew, prior to the accident, that the bolt would not close properly. Insofar as Remington makes this contention here, it has failed to adequately brief, and has, therefore, waived, it. E.g., Procter & Gamble Co. v. Amway Corp., 376 F.3d 496, 499 n. 1 (5th Cir.2004) (“Failure adequately to brief an issue on appeal constitutes waiver of that argument.”); Fed. R.App. P. 28(a)(9)(A). The same failure-to-brief waiver applies insofar as Matthews contends the district court erred for any rulings on motions in limine, including by not considering evidence of other incidents of claimed out of battery firings.
Bench-trial findings of fact are reviewed for clear error; legal conclusions, de novo. E.g., Kleinman v. City of San Marcos, 597 F.3d 323, 325 (5th Cir.2010). A question of statutory interpretation is, of course, reviewed de novo. E.g., Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc., 612 F.3d 800, 809 (5th Cir.2010). The establishment of each LPLA element is a question of fact, reviewed for clear error. Ellis v. Weasler Eng’g, Inc., 258 F.3d 326, 331-32 (5th Cir.2001); Johnson, 701 So.2d at 1363 (each product liability case is resolved primarily on its own particular facts). A finding of fact is clearly erroneous only if, “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed”. United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); see, e.g., Mumblow v. Monroe Broad., Inc., 401 F.3d 616, 622 (5th Cir.2005).
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer.
The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
*642 Therefore, at issue are whether the district court clearly erred by finding that: when Matthews fired the rifle, the bolt-assembly pin was missing, rather than out-of-specification; and such “use” should not have been “reasonably anticipated” by Remington. Regarding that use, at issue is whether the court erred in concluding that it was not merely firing the rifle, but firing it after someone had removed, and failed to reinstall, the bolt-assembly pin. “ ‘Reasonably anticipated use’ means a use or handling of a product that the product’s manufacturer should reasonably expect of an ordinary person in the same or similar circumstances.” La.Rev.Stat. Ann. § 9:2800.53(7).
A.
Concerning the district court’s finding of fact that the bolt-assembly pin was not in the rifle when Matthews fired it on the date of the accident, the rifle had been fired by numerous persons, including Matthews, after Margaret Minchew purchased it. Four witnesses (not including Matthews) who had fired the rifle denied disassembling it. Matthews was not asked whether he had done so. In addition, not all the persons who fired the rifle, after Margaret Minchew purchased it, testified. Moreover, there was no physical evidence to suggest the pin was present during firing.
Matthews maintains the district court clearly erred by finding the bolt-assembly pin was missing at the time of injury, rather than out of specification or not functioning as designed. In that regard, both sides’ expert witnesses conceded either scenario (pin missing or out of specification) was possible because there was no direct evidence that the pin was out of specification or not functioning, due to the fact that, following the accident, neither the pin nor any remnant of it was found. Remington’s expert testified it was more likely that the pin was missing; Matthews’, it was more likely that the pin was out of specification.
The district court found: “[a]t some point prior to the accident, ... someone disassembled the bolt assembly and failed to reinstall the bolt assembly pin”, Matthews, 2009 WL 2970441, at *2; “the locking lugs did not engage because the bolt assembly pin was not installed”, id.; and, “the accident was caused by the absence of [the] ... pin”, id. at *3 n. 1. Based on our review of the evidence, including for the reasons that follow, we can not say that these findings of fact were clearly erroneous.
Although Matthews’ expert opined that the accident occurred because the bolt-assembly pin was out of specification, as opposed to its not being installed when the rifle was fired, Remington’s expert testified that, during extensive testing, no bolt-assembly pins failed or broke, and he was not aware of any doing so post-manufacture. Moreover, there was no evidence inconsistent with the bolt-assembly pin’s having been removed and not reinstalled. Remington’s expert opined that the bolt-assembly pin was neither out of specification nor broken. In that regard, there was no evidence any bolt-assembly pin in the Model 710 rifle had been too short.
Before the accident, Remington had never been advised that a bolt-assembly pin was missing, and there was no evidence any Model 710 rifle had left Remington with the pin missing. Along that line, every Remington Model 710 rifle is test fired before it is sold. Based on markings on the holes in the bolt body for the rifle Matthews fired, the bolt-assembly pin had been in the rifle’s bolt assembly. While these markings indicated a bolt-assembly pin had been in place, there was no distortion or damage to the holes in the bolt *643 body revealing any unusual force had been applied to the pin. Remington’s expert opined that the pin was in the rifle when it left Remington and not in it on the date of the accident because it had been removed.
After the rifle was purchased by Margaret Minchew, it had been fired at least, approximately ten to 15 times. Numerous persons had fired it. Matthews testified that he had shot that rifle more than once prior to the accident. (And, therefore, had operated the rifle’s bolt action.) Matthews also testified he would not shoot a rifle that had been disassembled and reassembled without all its parts. In short, as Remington’s expert testified, the rifle had a functioning bolt-assembly pin when fired prior to the date of the accident. Moreover, not everyone who fired the rifle post-purchase by Margaret Minchew testified at trial; and she kept it readily accessible in a gun rack before loaning it to her daughter Amanda Minchew, approximately two to four weeks before the accident. (As noted, Nicholas Glass and Amanda Minchew lived next door to Matthews and his wife, another of Margaret Minchew’s daughters.) Amanda Minchew and Nicholas Glass testified that they did not fire the rifle after it was loaned to Amanda Minchew. On the other hand, Nicholas Glass changed the scope on the rifle.
Again, no one admitted to disassembling the rifle. But, as noted, not all who fired it post-purchase by Margaret Minchew testified. Matthews’ expert testified: if the rifle is disassembled and then reassembled, the person who did so should function test the bolt mechanism; and, if that test is performed and the bolt-assembly pin is missing, the bolt should come out of the rifle’s bolt assembly into that person’s hand. On the other hand, one of Remington’s experts testified, in response to a question by the court, that, if the pin is missing, but the bolt is pulled back very slowly, the bolt possibly would not react in that fashion. Matthews testified that, after the misfire, he pulled the bolt back slowly.
Regarding the district court’s finding the bolt-assembly pin was missing, instructive are the earlier-described reasons provided in the November 2009 order denying Matthews’ new-trial motion: “Evidence at trial established that the assembly pin was not defective, but was removed. Remington’s expert testified that the bolt assembly pin was manufactured to specifications and that the accident was caused by a missing, not broken, bolt assembly pin”. Matthews, 2009 WL 4456318, at *2. It goes without saying that the district court is in a “superior position to appraise and weigh the evidence”. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Fed.R.CivP. 52(a)(6) (“Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court’s opportunity to judge the witnesses’ credibility.”).
There were numerous instances for which the district court had to appraise and weigh the evidence and judge witnesses’ credibility. For example, Nicholas Glass, who lived with Margaret Minchew’s daughter Amanda Minchew on the date of the accident, was asked on cross-examination whether Margaret Minchew gave the rifle to him (it appears instead to have been loaned to Amanda Minchew) because Margaret Minchew was concerned that the young son (about age 13 on the date of the accident) of the man with whom she lived “had been messing with” the rifle. Glass answered instead that the rifle was given to him because Margaret Minchew was concerned that the young person would shoot one of her horses with it. Remington then read for impeachment purposes *644 the portion of Glass’ deposition in which he had testified that Margaret Minchew gave the rifle to him because she was concerned that the young person “had been messing with the gun”. Glass admitted he had so testified in his deposition.
Other examples of pertinent, conflicting evidence are whether Glass had fired the rifle (he denied doing so; Amanda Min-chew testified on cross-examination that he had, after testifying on direct that he had not); whether Glass told Matthews on the day of the accident that he (Glass) had changed the scope on the rifle and it needed to be sighted (Glass testified he had changed the scope; Amanda Minchew testified Glass told Matthews to sight the rifle because he (Glass) had changed the scope; and Matthews testified Glass did not tell him that); and the time that elapsed between when Matthews borrowed the rifle on the day of the accident and the accident occurred (Matthews testified ten minutes elapsed; Amanda Minchew, 30 minutes to an hour; her deposition was then read to her for impeachment, in which she had testified that one to two hours had elapsed; she then testified at trial “it may have been” one to two hours, consistent with her deposition).
As stated, there were numerous instances of this type for the court to consider, including for the expert witnesses’ testimony, in making its findings of fact. These type credibility and evidence-appraisal questions are for the district, not this, court. “When the district court is faced with testimony that may lead to more than one conclusion, its factual determinations will stand so long as they are plausible — even if we would have weighed the evidence otherwise.” Nielsen v. United States, 976 F.2d 951, 956 (5th Cir.1992). As stated, on this record and under this highly deferential standard, we can not say the district court clearly erred in finding the bolt-assembly pin was not in the rifle when Matthews fired it and suffered injuries from the uncontained explosion.
B.
In the light of our not finding clearly erroneous the district court’s missing-pin finding of fact, next at issue are: the district court’s conclusion of law for the applicable LPLA scope-of-use; and its finding of fact, based on that scope-of-use, that Matthews’ use of the rifle (with a missing bolt-assembly pin) was not reasonably anticipated by Remington. The district court did not err in its scope-of-use conclusion; and we can not say that its not-reasonably-anticipated-use finding of fact was clearly erroneous.
1.
For obvious reasons, “the level of generality at which a plaintiffs ‘use’ of a product is defined will bear directly on whether [he] satisfies the LPLA’s reasonably anticipated use requirement”. Kampen, 157 F.3d at 310. Again, a critical issue is whether Matthews’ “use” of the Model 710 rifle is limited to his firing it or includes the removal of, but failure to reinstall, the bolt-assembly pin. As discussed, the district court interpreted “use” at a level of generality that included firing the rifle without the bolt-assembly pin, as opposed to firing it. Again, this interpretation included someone’s removal of, and failure to reinstall, the bolt-assembly pin prior to Matthews’ firing the rifle. And as noted, because the scope-of-use inquiry requires interpreting LPLA, our review is de novo. See Kleinman, 597 F.3d at 325.
A scope-of-use decision is premised on “the apparent purpose of the reasonably anticipated use requirement!:] ... ‘to express the types of product uses and misuses by a consumer that a manufactur *645 er must take into account when he designs a product [and] drafts instructions for its use ... in order that the product not be unreasonably dangerous.’ ” Kampen, 157 F.3d at 310-11 (citation and internal quotation marks omitted) (quoting John Kennedy, A Primer on the Louisiana Products Liability Act, 49 La. L.Rev. 565, 584 (1989)) (Kennedy was a co-drafter of LPLA.). For that LPLA action against the manufacturer of a vehicle jack, our en banc court in Kampen held: the scope of use included not only claimant’s jacking up the vehicle, but also, while the vehicle was in that position, crawling under it. Id. at 312.
For the scope-of-use inquiry, Kampen held: “We thus define [plaintiffs] ‘use’ of the jack at a level of generality that will take into account the risks [the manufacturer] must (or should) have reasonably contemplated when designing the jack....” Id. at 311. Consistent with the warnings not to do so, provided in the owner’s manual and in the vehicle’s spare-tire compartment, those risks were that the claimant would not only jack up the vehicle, but also, after doing so, crawl under it. Kampen further held: “[I]f we consider that Kampen’s ‘use’ of the jack includes his jacking up the car and nothing else, then the question of reasonably anticipated use answers itself: a manufacturer quite reasonably anticipates his jack to be used for jacking!” Id. at 310. Similarly, it is obvious that firing a rifle, with all of its parts in place, is reasonably anticipated.
In reaching the holding that defendant did not reasonably anticipate this expanded use (jack-up and crawl-under), id. at 312, Kampen provided a detailed analysis of Louisiana cases interpreting LPLA’s reasonably-anticipated-use element, including which conduct constituted a “use”. See id. at 310-12. Louisiana courts have interpreted “use” to include interactions with the product prior to the claimant’s injury. See Johnson, 701 So.2d at 1365 (affirming jury’s finding that using a saw after either claimant, or another, had removed the manufacturer’s guard was not a “reasonably anticipated use”); Delphen v. Dep’t of Transp. & Dev., 657 So.2d 328, 334 (La. App. 4th Cir.1995) (holding claimant’s “use” was borrowing and riding an obviously dangerous racing bicycle without obtaining additional instructions regarding use and knowing the wheel had previously become loose). As reflected in our enbanc opinion in Kampen, our court has applied the Louisiana-state-court LPLA interpretation. E.g., Broussard v. Procter & Gamble Co., 517 F.3d 767, 769-70 (5th Cir.2008) (holding “use” of heatwrap in contravention of warning not “reasonably anticipated”) (citing Kampen, 157 F.3d at 314); Ellis, 258 F.3d at 337-38 (holding “reasonably anticipated use” of pecan harvester included walking between tractor and harvester to inspect harvester while running); Hunter v. Knoll Rig & Equip. Mfg. Co., 70 F.3d 803, 810 (5th Cir.1995) (holding racking pipes against a racking board in an uncommon and “obviously dangerous” manner was not a “reasonably anticipated use”); see La.Rev.Stat. Ann. § 9:2800.53(7) (“‘Reasonably anticipated use’ means a use or handling of a product that the product’s manufacturer should reasonably expect of an ordinary person in the same or similar circumstances.”); Kampen, 157 F.3d at 311 (“[W]e observe .that ‘reasonably anticipated use’ is defined [in § 9:2800.53(7)] in terms of a ‘use or handling’ of the product”.) (emphasis in original).
Again, the LPLA section at issue provides: “The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of *646 the product by the claimant or another person or entity”. La.Rev.Stat. Ann. § 9:2800.54(A) (emphasis added). “[U]se of the product by [Matthews] or another person” is linked, of course, to the district court’s above-discussed finding of fact, which we can not say is clearly erroneous, that, “[a]t some point prior to the accident, ... someone disassembled the bolt assembly and failed to reinstall the bolt assembly pin”. Matthews, 2009 WL 2970441, at *2 (emphasis added). In the light of its scope-of-use conclusion, the district court was not required to find whether that “someone” was Matthews or another person.
As noted, in Johnson, the Louisiana appellate court affirmed the jury’s finding that using a saw after the manufacturer’s guard had been removed was not a “reasonably anticipated use”. 701 So.2d at 1365. In so doing, the court found it was unclear whether the guard had been removed by the claimant or by another. Id. at 1362, 1364. In Hunter, our court found the manner in which pipes were leaned against a racking board was not reasonably anticipated. 70 F.3d at 810. In that case, it was not only the claimant’s interaction with the product, but also those by other experienced workers, that resulted in the pipes being racked improperly. Id. at 805, 810. These decisions demonstrate, inter alia, that, consistent with LPLA § 9:2800.54(A) (defining “use” to include “use of the product by the claimant or another person or entity” (emphasis added)), “use” of a product is determined by examining overall interactions with a product — including another person’s handling it.
Accordingly, “use” under LPLA includes interactions with the product by Matthews and others. The scope of the “use” included the removal of, and failure to reinstall, the bolt-assembly pin prior to Matthews’ firing the rifle because, in order to be held liable under LPLA, that is the “use” Remington had to have “reasonably anticipated” (“expect[ed]”). See La.Rev.Stat. Ann. § 9:2800.53(7) (“ ‘Reasonably anticipated use’ means a use or handling of a product that the product’s manufacturer should reasonably expect of an ordinary person in the same or similar circumstances.”).
2.
Therefore, in the light of this scope-of-use, at issue is whether it was “reasonably anticipated” by Remington that someone would fail to reinstall the bolt-assembly pin and that the rifle would be fired in that condition. As discussed, the establishment of each LPLA element is a question of fact, reviewed for clear error. Ellis, 258 F.3d at 331-32; Johnson, 701 So.2d at 1366.
Again, “‘Reasonably anticipated use’ means a use or handling of a product that the product’s manufacturer should reasonably expect of an ordinary person in the same or similar circumstances”. La. Rev.Stat. Ann. § 9:2800.53(7) (emphasis added). “This objective inquiry requires us to ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture.” Kampen, 157 F.3d at 309 (emphasis added) (citing Myers v. Am. Seating Co., 637 So.2d 771, 775 (La.App. 1st Cir.1994)). Accordingly, at issue is whether the district court clearly erred by finding that Remington, at the time of manufacture, should not have reasonably expected Matthews’ “use”: firing a Model 710 rifle after someone had removed, but failed to reinstall, the bolt-assembly pin. See Butz, 762 So.2d at 1218; Hunter, 70 F.3d at 806-07, 810.
“ ‘[Reasonably anticipated use’ is more restrictive than the broader, [preLPLA] standard of ‘normal use’ ”, and it *647 does not suggest manufacturer liability “for every conceivable foreseeable use of a product”. Delphen, 657 So.2d at 333-34; see also Lockart v. Kobe Steel Ltd. Constr. Mach. Div., 989 F.2d 864, 868 (5th Cir. 1993). “The LPLA’s ‘reasonably anticipated use’ standard should be contrasted with the pre-LPLA ‘normal use’ standard; ‘normal use’ included ‘all intended uses, as well as all reasonably foreseeable uses and misuses of the product.’ ” Kampen, 157 F.3d at 309 (citing Hale Farms, Inc. v. Am. Cyanamid Co., 580 So.2d 684, 688 (La.App. 2d Cir.1991)). “ ‘Normal use’ also included ‘reasonably foreseeable misuse that is contrary to the manufacturer’s instructions.’ ” Id. (emphasis removed) (citing Hale Farms, 580 So.2d at 688).
Under LPLA, whether a use is reasonably anticipated is an objective standard ascertained from the manufacturer’s viewpoint at the time of manufacture. Payne v. Gardner, 56 So.3d 229, 231-32 (La.2011); Green v. BDI Pharm., 803 So.2d 68, 75 (La.App. 2d Cir.2001); Hunter, 70 F.3d at 809 n. 7; Daigle v. Audi of Am., Inc., 598 So.2d 1304, 1307 (La.App. 3d Cir.1992) (quotation omitted). “It is clear that by adopting the reasonably anticipated use standard, the Louisiana Legislature intended to narrow the range of product uses for which a manufacturer would be responsible.” Kampen, 157 F.3d at 309 (citing Delphen, 657 So.2d at 333; Myers, 637 So.2d at 775).
We can not say that the district court clearly erred in finding that Remington should not have reasonably anticipated (reasonably expected) the rifle to be fired after someone had removed, but failed to reinstall, the bolt-assembly pin. This is evidenced by the instructions in Remington’s Model 710 owner’s manual to reinstall the bolt-assembly pin when reassembling the bolt assembly. Of course, it was “reasonably foreseeable” that a user might drop the bolt-assembly pin during reassembly, as evidenced by the instruction from Remington to its assembly workers to keep a finger beneath the bolt-assembly-pin hole during the initial assembly; however, that is not the LPLA standard. The standard is: at the time of manufacture, how did the manufacturer reasonably expect its product to be used by an ordinary person.
“[T]he LPLA requires a link between damages and reasonably anticipated use.... [I]f damages are linked to a product misuse (i.e., one that is not reasonably anticipated), then those damages are not recoverable under the Act”. Kampen, 157 F.3d at 316; see also Payne, 56 So.3d 229, 231-32. Here, the damages incurred by Matthews are directly caused by his firing the rifle after someone had removed the bolt-assembly pin and failed to reinstall it. For the reasons that follow, and in the light of the trial evidence, we can not say that the district court clearly erred in finding that such “use” was not “reasonably anticipated” by Remington.
Matthews failed to prove Remington, at the time of manufacture of the rifle at issue, was aware of a single other incident where a Model 710 rifle, or any rifle using a similar two-piece bolt assembly, was fired without a properly installed and functioning bolt-assembly pin. The district court found:
Remington anticipated that a user would disassemble the Model 710 bolt assembly for cleaning and remove the bolt assembly pin, but Mr. and Mrs. Matthews have not presented persuasive evidence that Remington also should have anticipated that users would fail to reinstall the bolt assembly pin. Both lay and expert witnesses testified that an ordinary firearm user knows and understands that reassembly of a firearm with all its parts is critical to safe oper *648 ation. The Court, therefore, finds that Remington was entitled to expect that an ordinary user would reassemble the rifle with all its parts, absent special circumstances not present in this case.
Matthews, 2009 WL 2970441, at *4 (emphasis added).
Acknowledging again that the district court is in a superior position to appraise and weigh the evidence, “the force and effect of the testimony, considered as a whole”, does not convince us “that the findings are so against the great preponderance of the credible testimony that they do not reflect or represent the truth and right of the case”. Mumblow, 401 F.3d at 622 (citation omitted). Under LPLA, what a manufacturer should reasonably anticipate is determined by how the manufacturer expected the product to be used by an ordinary person. Again, we can not say the district court clearly erred by finding Remington should not have expected a Model 710 rifle to be fired after someone had removed, but failed to reinstall, the bolt-assembly pin.[2]
III.
For the foregoing reasons, the judgment is AFFIRMED.

. Section 9:2800.54 provides:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity. B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(5) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

. The dissent does not challenge the two above-discussed critical findings of fact that we can not say are clearly erroneous: the bolt-assembly pin was not in the rifle when Matthews fired it; and Remington should not have expected the rifle to be fired after someone had removed, but failed to reinstall, that pin. (Therefore, the dissent’s statements of fact at 2-3, note 3, including about the sale of extra bolt-assembly pins, are of no moment.) The dissent instead challenges only our holding, on de novo review, that the applicable LPLA reasonably-anticipated scope-of-use was not just Matthews’ firing the rifle; it was his firing it with the missing bolt-assembly pin.
In advancing a theory not urged by Matthews, the dissent maintains the missing-pin aspect can not, as a matter of law, be attributed to Matthews, akin to his being an innocent bystander. As discussed supra, however, the district court did not find Matthews was not the "someone” who removed, and failed to reinstall, the pin because it was not necessary to do so. Therefore, the dissent repeatedly errs in stating someone other than Matthews did so.
In any event, who did so is irrelevant; what is relevant is the use Remington could "reasonably anticipate[ ] ... by the claimant [Matthews] or another person or entity”. La.Rev. Stat. Ann. § 9:2800.54(A). In short, for the reasons presented supra, it matters not when the pin was removed and not re-installed and, assuming he was not the person who did so, whether it was outside Matthews’ presence. Again, what is relevant, pursuant to the plain language of the LPLA, is the reasonably anticipated use of the product, whether by Matthews or another, including the reason for the missing bolt-assembly pin. Therefore, the dissent’s fundamental error is asserting that the applicable scope-of-use should be limited to Matthews’ firing the rifle (or, as the dissent erroneously phrases it: "his reasonably anticipated use”, Dissent at 649 (emphasis added); and "his own personal use”, id. at 654). That analysis writes "or another person or entity” out of the LPLA and converts it from imposing product, to imposing absolute, liability.